*552 Opinion
KENNARD, J.
A charter city entered into certain contracts for the construction of public buildings. A federation of labor unions then petitioned the superior court for a peremptory writ of mandate, asserting that the city must comply with California’s prevailing wage law notwithstanding local ordinances stating otherwise. The prevailing wage law requires that certain minimum wage levels be paid to contract workers constructing public works.
Under the state Constitution, the ordinances of charter cities supersede state law with respect to “municipal affairs” (Cal. Const., art. XI, § 5), but state law is supreme with respect to matters of “statewide concern” (California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 17 [283 Cal.Rptr. 569, 812 P.2d 916] (California Fed. Savings)). Here, petitioner contends that the subject matter of the state’s prevailing wage law is a “statewide concern” over which the state has primary legislative authority. (Ibid.) The city responds that the matter is a municipal affair and therefore governed by its local ordinances. We agree with the city.
I. Facts
In 2006, the voters of the City of Vista in San Diego County approved a 0.5 percent sales tax to fund the construction and renovation of several public buildings. The proposed projects involved the seismic retrofit of an existing fire station and the construction of two new fire stations, a new civic center, a new sports park, and a new stagehouse for the city’s Moonlight Amphitheatre. At that time, Vista was a general law city.[1] In February 2007, the Vista City Attorney submitted a report to the city council recommending that Vista take steps to become a charter city. The report asserted that the conversion would give the city the option of not paying prevailing wages on its planned public works projects, “resulting] in millions of dollars of savings over the next few years and beyond.”
The Vista City Council then authorized a special election for residents of the city to vote on a ballot measure that would change Vista from a general law city into a charter city. In the voter information pamphlet, the “City *553 Attorney Impartial Analysis” told the voters that, as a charter city, Vista’s city council “replaces the state legislature with regard to the municipal affairs of the City[, which] . . . include bidding and contracting procedures . . . .” (City of Vista Sample Ballot & Voter Information Pamp., Special Municipal Elec., June 5, 2007, analysis of Prop. C, p. 003.) That same point was made in the ballot argument in favor of the proposal, signed by the mayor and members of the city council, which also noted that the conversion would allow the city to “choose when and if it pays ‘prevailing wages.’ ” (Id., argument in favor of Prop. C, p. 004.) There was no opposing ballot argument.
The ballot measure passed with approximately 67 percent of the votes cast. Shortly thereafter, Vista amended a city ordinance to prohibit any city contract from requiring payment of prevailing wages unless (a) such payment is compelled by the terms of a state or a federal grant, (b) the contract does not involve a municipal affair, or (c) payment of the prevailing wage is separately authorized by the city council.
In October 2007, Vista’s city council adopted a resolution approving contracts to design and build two fire stations and authorizing the mayor to execute the contracts. The contracts did not require compliance with the state’s prevailing wage law. A court action by plaintiff followed.
Plaintiff State Building and Construction Trades Council of California, AFL-CIO (the Union), is a labor federation composed of 131 local unions, 16 district labor councils, and 22 local building trades councils that collectively represent more than 300,000 men and women working in the construction industry in California. The Union petitioned the San Diego County Superior Court for a peremptory writ of mandate to direct Vista and its officeholders to comply with the state’s prevailing wage law. Vista countered that prevailing wage issues are not a statewide concern, and that “charter cities have the legal right to determine whether or not to require ‘prevailing wages’ in local public works contracts that involve locally funded, ‘municipal affairs’ under the California Constitution and the laws governing charter cities.” The Union moved for issuance of a peremptory writ of mandate. The Union argued that the prevailing wage law “addresses important statewide concerns” and therefore it applies to charter cities “just as it applies to other cities.” In support of its petition, the Union submitted a declaration of its president, Robert L. Balgenorth, asserting the regional nature of the construction industry and describing apprenticeship training in that industry. Vista opposed the motion, arguing that as a matter of law “Charter Cities have fiscal control over local ‘municipal affairs’ and these Cities can determine whether to include ‘prevailing wage’ requirements in local public works contracts.”
*554 The trial court denied the Union’s petition, citing Vial v. City of San Diego (1981) 122 Cal.App.3d 346 [175 Cal.Rptr. 647]. Vial concerned a city council resolution adopted by San Diego (a charter city) that barred payment of prevailing wages except in specified circumstances. The state sought to compel the city to comply with the state’s prevailing wage law. (Id. at p. 347.) The Court of Appeal in Vial upheld the city’s resolution, stating that the expenditure of city funds on public works projects and the rates of pay of workers hired for such projects are municipal affairs of a charter city over which the state has no legislative authority. (Id. at p. 348.)
The Union here appealed. In a two-to-one decision, the Court of Appeal affirmed the trial court. After observing that both the legislative record and the trial court record were inadequate to establish that application of the prevailing wage law to charter cities is necessary to protect regional labor markets, the Court of Appeal concluded that the Union had failed to prove the existence of a statewide concern. In the dissent’s view, however, the wage levels of contract workers constructing public works can have a depressive effect on regional wages, and therefore they are a statewide concern.
We granted the Union’s petition for review to decide whether the state’s prevailing wage law applies to charter cities.
II. Discussion
A. California’s Prevailing Wage Law
In 1931, the California Legislature enacted the state’s prevailing wage law.[2] That law, which was then entitled the “Public Wage Rate Act,” required contractors on “public works” projects to pay “the general prevailing rate of per diem wages for work of a similar character in the locality in which the work is performed.” (Stats. 1931, ch. 397, § 1, p. 910.) The term “public works” was defined as work done for public agencies and work paid for with public funds. (Id., § 4, pp. 911—912.) The law expressly referred to charter cities in a provision requiring such cities to pay prevailing wages in contracts for street or sewer improvement work. (Ibid.)
Earlier the same year, Congress had enacted the Davis-Bacon Act (Pub.L. No. 71-798 (Mar. 3, 1931) 46 Stat. 1494, codified at 40 U.S.C. *555 §§ 3141-3148); the goals of the federal and the state legislation were similar. (See, e.g., California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc. (1997) 519 U.S. 316, 319 [136 L.Ed.2d 791, 117 S.Ct. 832].) Simply put, “[prevailing wage laws are based on the . . . premise that government contractors should not be allowed to circumvent locally prevailing labor market conditions by importing cheap labor from other areas.” (Independent Roofing Contractors v. Department of Industrial Relations (1994) 23 Cal.App.4th 345, 356 [28 Cal.Rptr.2d 550].) Many states have adopted some form of a prevailing wage law for public construction projects. (See, e.g., 820 HI. Comp. Stat. 130/1 to 130/12; N.Y. Labor Law § 220.3(a); 43 Pa. Cons. Stat. §§ 165-1 to 165-17; Tex. Gov. Code Ann. §§ 2258.001 to 2258.058.)
When the California Legislature established the Labor Code in 1937, it replaced the 1931 Public Wage Rate Act with a revised, but substantively unchanged, version of the same law. (Stats. 1937, ch. 90, § 1720 et seq., pp. 241-246.) The 1937 law, like the 1931 law, directed the “body awarding any contract” to “ascertain the general prevailing rate of per diem wages in the locality ... for each craft or type of workman needed to execute the contract.” (Stats. 1937, ch. 90, § 1773, p. 243; see Stats. 1931, ch. 397, § 2, p. 910.) As a result of a 1976 amendment, the prevailing wage law now requires that local wage rates be determined by the Director of California’s Department of Industrial Relations rather than by the body awarding the contract (Stats. 1976, ch. 281, § 2, p. 587), but the prevailing wage law’s general purpose and scope remain largely unchanged.
Here, Vista contends that it need not comply with the prevailing wage law because the law invades Vista’s constitutionally guaranteed autonomy as a charter city. In resolving the issue, we begin with a brief overview of the home rule doctrine set forth in the California Constitution.
B. California’s Home Rule Doctrine
Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs. Article XI, section 5, subdivision (a) of the California Constitution provides: “It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith.” (Italics added.) The roots of this provision trace back more than 100 years. *556 (See generally Johnson v. Bradley (1992) 4 Cal.4th 389, 394-398 [14 Cal.Rptr.2d 470, 841 P.2d 990].) It was originally “enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.” (Fragley v. Phelan (1899) 126 Cal. 383, 387 [58 P. 923] (lead opn. of Garoutte, J.).) The provision represents an “affirmative constitutional grant to charter cities of ‘all powers appropriate for a municipality to possess . . .’ and [includes] the important corollary that ‘so far as “municipal affairs” are concerned,’ charter cities are ‘supreme and beyond the reach of legislative enactment.’ ” (California Fed. Savings, supra, 54 Cal.3d at p. 12, quoting Ex Parte Braun (1903) 141 Cal. 204, 207 [74 P. 780].)
In California Fed. Savings, supra, 54 Cal.3d 1, we set forth an analytical framework for resolving whether or not a matter falls within the home rule authority of charter cities. First, a court must determine whether the city ordinance at issue regulates an activity that can be characterized as a “municipal affair.” (Id. at p. 16.) Second, the court “must satisfy itself that the case presents an actual conflict between [local and state law].” (Ibid.) Third, the court must decide whether the state law addresses a matter of “statewide concern.” (Id. at p. 17.) Finally, the court must determine whether the law is “reasonably related to . . . resolution” of that concern (ibid.) and “narrowly tailored” to avoid unnecessary interference in local governance (id. at p. 24). “If ... the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a ‘municipal affair’ pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.” (Id. at p. 17.)
Here, we reaffirm our view—first expressed 80 years ago (see City of Pasadena v. Charleville (1932) 215 Cal. 384, 389 [10 P.2d 745] (Charleville))—that the wage levels of contract workers constructing locally funded public works are a municipal affair (that is, exempt from state regulation), and that these wage levels are not a statewide concern (that is, subject to state legislative control). Our reasons are set forth in the course of the analysis given below.
C. Applicability of California’s Home Rule Doctrine Is a Question of Law
The Court of Appeal treated the dispute in this case as a factual one, and it characterized its decision against the Union in terms of a failure of proof. For example, the court observed: “[T]he question we face is whether either the *557 Legislature or the [Union] ha[s] demonstrated a fact-bound justification for application of the [prevailing wage law] to charter cities. As we explain more fully, we do not find any such justification on the record presented.” Later in its opinion, the Court of Appeal said: “[T]he Legislature has not articulated any rationale which would support the conclusion that complete preemption of municipal public works contracting is needed to protect regional labor markets.” With regard to the evidentiary record made by the Union, the court said: “Plainly . . . [various parts of the trial court record] establish that the labor markets in the construction trades are regional rather than local. . . . [However,] the factual record presented by the [Union] offers no evidence which suggests the contracting activity of municipalities materially impacts regional labor markets.”
Thus, the Court of Appeal here did not hold that the wage levels of contract workers constructing a locally funded public work are categorically a municipal affair and not a statewide concern. Rather, the Court of Appeal held that the legislative record was inadequate to establish a statewide concern and that the Union had failed to prove its case in the trial court.
The Court of Appeal’s approach raises the question whether the determination of a statewide concern presents predominantly a legal or a factual question. Fundamentally, the question is one of constitutional interpretation; the controlling inquiry is how the state Constitution allocates governmental authority between charter cities and the state. The answer to that constitutional question does not necessarily depend on whether the municipal activity in question has some regional or statewide effect. For example, we have said that the salaries of charter city employees are a municipal affair and not a statewide concern regardless of any possible economic effect those salaries might have beyond the borders of the city. {Sonoma County Organization of Public Employees v. County of Sonoma (1979) 23 Cal.3d 296, 316-317 [152 Cal.Rptr. 903, 591 P.2d 1] {Sonoma County).)
Of course, the inquiry is not wholly removed from historical, and hence factual, realities. In California Fed. Savings, supra, 54 Cal.3d at pages 17 to 18, for example, we said: “[C]ourts should avoid the error of ‘compartmentalization,’ that is, of cordoning off an entire area of governmental activity as either a ‘municipal affair’ or one of statewide concern. Beginning with the observation in Pac. Tel. & Tel. Co. v. City and County of S. F. [(1959)] 51 Cal.2d [766,] 111 [336 P.2d 514], that ‘the constitutional concept of municipal affairs is not a fixed or static quantity . . . \but one that] changes with the changing conditions upon which it is to operate,’ our cases display a growing recognition that ‘home rule’ is a means of adjusting the political relationship between state and local governments in discrete areas of conflict. When a court invalidates a charter city measure in favor of a conflicting state *558 statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city.” (Italics added.)
Nevertheless, the question whether in a particular case the home rule provisions of the California Constitution bar the application of state law to charter cities turns ultimately on the meaning and scope of the state law in question and the relevant state constitutional provisions. Interpreting that law and those provisions presents a legal question, not a factual one. (County of Riverside v. Superior Court (2003) 30 Cal.4th 278, 286-287 [132 Cal.Rptr.2d 713, 66 P.3d 718] {County of Riverside)', Sonoma County, supra, 23 Cal.3d at p. 316; Bishop v. City of San Jose (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137] {Bishop).) Courts accord great weight to the factual record that the Legislature has compiled {California Fed. Savings, supra, 54 Cal.3d at pp. 20-25; Baggett v. Gates (1982) 32 Cal.3d 128, 136-137 [185 Cal.Rptr. 232, 649 P.2d 874]), and also to any relevant facts established in trial court proceedings. {California Fed. Savings, at p. 20, fn. 16.) Factual findings by the Legislature or the trial court, however, are not controlling. {Bishop, at p. 63.) The decision as to what areas of governance are municipal concerns and what are statewide concerns is ultimately a legal one.
Therefore, the Court of Appeal here gave too much weight to the Union’s asserted failure to prove its case, implying that the issue before the court was one of sufficiency of the evidence. The answer to whether the prevailing wage law can be applied constitutionally to charter cities is not conclusively determined solely by the evidentiary record in the trial court or by the legislative record. The question remains one of state constitutional interpretation. {County of Riverside, supra, 30 Cal.4th at pp. 286-287; Sonoma County, supra, 23 Cal.3d at p. 316; Bishop, supra, 1 Cal.3d at p. 63.)
D. Application of California Fed. Savings’s Four-part Test
We now apply the four-part test of this court’s 1991 decision in California Fed. Savings, supra, 54 Cal.3d at pages 16 to 17, which we summarized at page 556, ante.
1. Whether the wages of contract workers constructing locally funded public works are a municipal affair
The wage levels of contract workers constructing locally funded public works are certainly a “municipal affair.” We said so explicitly in our 1932 decision in Charleville, supra, 215 Cal. at page 389, which was the test case we took immediately after the Legislature’s 1931 enactment of the prevailing *559 wage law to decide whether that law applied to charter cities. Charleville was a mandate action brought to compel a charter city’s manager to sign a contract for the construction of a fence around a city-owned reservoir. (Id. at p. 387.) The city manager refused to sign the contract, contending (among other things) that the contract did not comply with the state’s newly enacted prevailing wage law. (Ibid.) The petition for a writ of mandate asserted that the prevailing wage law did not apply to charter cities, and this court agreed.
We there held that the issue of wage levels of contract workers improving a city-owned reservoir was, as a matter of law, a “municipal affair.” (Charleville, supra, 215 Cal. at p. 389.) We said: “The sole purpose of the contract is the construction of a wire fence around a reservoir which is a part of the city’s municipal water system. The supplying of water by a city to its inhabitants is a municipal affair. [Citation.] The building of a dam to be used for impounding water for a municipal water system is a municipal affair. [Citation.] The construction of a reservoir as a part of a municipal water system is a municipal affair. [Citation.] The money to be expended for the cost of the improvement belongs to the city and the control of its expenditure is a municipal affair. [Citation.] The hiring of employees generally by the city to perform labor and services in connection with its municipal affairs and the payment of the city’s funds for services rendered to the city by its employees in the administration of its municipal affairs is not subject to or controlled by general laws. [Citations.]” (Ibid.)
It is apparent from our analysis in Charleville, supra, 215 Cal. at page 389, that the construction of a city-operated facility for the benefit of a city’s inhabitants is quintessential^ a municipal affair, as is the control over the expenditure of a city’s own funds. Here, the two fire stations in the City of Vista, like the municipal water system in Charleville, supra, 215 Cal. 384, are facilities operated by the city for the benefit of the city’s inhabitants, and they are financed from the city’s own funds. We conclude therefore that the matter at issue here involves a “municipal affair.”
2. Existence of an “actual conflict” between state law and charter city law
This court’s 1991 decision in California Fed. Savings, supra, 54 Cal.3d at pages 16-17, emphasized the importance of determining, as a matter of statutory construction, that state law actually conflicts with local law before proceeding to the difficult state constitutional question of which law governs a particular matter. Here, no party contends that California’s prevailing wage law exempts charter cities from its scope. Indeed, the prevailing wage law makes express reference to charter cities, defining “ ‘public works’ ” to include “[s]treet, sewer, or other improvement work . . . *560 of any political subdivision or district [of the state], whether the political subdivision or district operates under a freeholder’s charter or not.” (Lab. Code, § 1720, subd. (a)(3), italics added; see also id., subd. (a)(1) [applying the law to any construction work “done under contract and paid for . . . out of public funds”].) Because the state’s prevailing wage law does not exempt charter cities, and because Vista’s ordinance prohibits compliance with that law (except in circumstances not relevant here), we conclude that an actual conflict exists between state law and Vista’s ordinance.
3. Whether the wage levels of contract workers constructing locally funded public works is a statewide concern
When, as here, state law and the ordinances of a charter city actually conflict and we must decide which controls, “the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations.” (California Fed. Savings, supra, 54 Cal.3d at p. 18.) In other words, for state law to control there must be something more than an abstract state interest, as it is always possible to articulate some state interest in even the most local of matters. Rather, there must be “a convincing basis” for the state’s action—a basis that “justifies]” the state’s interference in what would otherwise be a merely local affair. (Ibid.) Here, that convincing justification is not present.
We reached essentially the same conclusion when we addressed the question in our 1932 decision in Charleville, supra, 215 Cal. 384. We there held that the wage levels of contract workers improving a city-owned reservoir were not a matter of “general state concern.” (Id. at p. 393.) Likewise, the wage levels of contract workers designing and constructing two city-operated firehouses do not appear to be a matter of “general state concern.” The Union, however, argues that circumstances have changed since our 1932 Charleville decision, and that what was not a statewide concern then has since become a statewide concern. The Union quotes a statement by this court in Pac. Tel. & Tel. Co. v. City & County of S. F, supra, 51 Cal.2d 766, at page 771: “[T]he constitutional concept of municipal affairs is not a fixed or static quantity. It changes with the changing conditions upon which it is to operate. What may at one time have been a matter of local concern may at a later time become a matter of state concern controlled by the general laws of the state.” (Italics added.)
The Union points out that as a result of a 1976 amendment to the state’s prevailing wage law (Stats. 1976, ch. 281, § 2, p. 587), the wage levels mandated by that law are no longer set by the local body awarding the *561 contract but by the Director of the Department of Industrial Relations, and under the amended law, these mandatory wage levels reflect regional rather than simply local interests (Lab. Code, §§ 1770, 1773, 1773.1, 1773.9). In light of these statutory changes, the Union argues, the wage levels of contract workers constructing locally funded public works have become a matter of statewide concern.
In a related argument, the Union contends that the economy of the state has become more integrated during the 80 years since this court’s 1932 decision in Charleville, supra, 215 Cal. 384, and wage levels in a local area are now more likely to have an effect regionally and statewide. The construction industry in particular, according to the Union, has followed this trend toward economic regionalization, with workers often driving long distances to a jobsite and multiemployer collective bargaining agreements governing the terms of employment on a regional basis. Because of these economic changes, the Union asserts, the refusal of charter cities to pay prevailing wages has a depressive impact on regional labor standards that was not present in 1932 when Charleville was decided. Therefore, the Union argues, the expenditure of city funds on a local public work is no longer a purely local concern; rather, in light of our modem integrated economy, it has become a statewide concern.
The Union further notes that the state’s prevailing wage law now requires contractors on public works projects to hire apprentices from state-approved apprenticeship programs, thereby ensuring the proper training of the next generation of skilled construction workers. (Lab. Code, § 1777.5.) The Union contends that this requirement of the prevailing wage law is essential to California’s long-term economic health. If the prevailing wage law did not include this requirement, the Union argues, then construction contractors bidding competitively on public works projects would refuse to hire apprentices, in an effort to reduce costs; apprentices then might not be able to obtain enough work to support themselves and to complete their on-the-job training requirement. The Union asserts that the training of the next generation of skilled construction workers is a statewide concern, not merely a local concern, and the prevailing wage law has become an integral part of the state’s scheme for training these workers.
These arguments by the Union underscore the importance of identifying correctly the question at issue. Certainly regional labor standards and the proper training of construction workers are statewide concerns when considered in the abstract. But the question presented here is not whether the state government has an abstract interest in labor conditions and vocational training. Rather, the question presented is whether the state can require a charter city to exercise its purchasing power in the construction market in a *562 way that supports regional wages and subsidizes vocational training, while increasing the charter city’s costs. No one would doubt that the state could use its own resources to support wages and vocational training in the state’s construction industry, but can the state achieve these ends by interfering in the fiscal policies of charter cities? Autonomy with regard to the expenditure of public funds lies at the heart of what it means to be an independent governmental entity. “ ‘[W]e can think of nothing that is of greater municipal concern than how a city’s tax dollars will be spent; nor anything which could be of less interest to taxpayers of other jurisdictions.’ ” (Johnson v. Bradley, supra, 4 Cal.4th at p. 407.) Therefore, the Union here cannot justify state regulation of the spending practices of charter cities merely by identifying some indirect effect on the regional and state economies. (See County of Riverside, supra, 30 Cal.4th at p. 296 [“No doubt almost anything a county does . . . can have consequences beyond its borders. But this circumstance does not mean this court may eviscerate clear constitutional provisions, or the Legislature may do what the Constitution expressly prohibits it from doing.”].)
The Union’s arguments also conflict with our previous decisions. In Sonoma County, supra, 23 Cal.3d at page 297, we held that the wages paid by a charter city or county to its own employees are a municipal affair and therefore are not subject to regulation by the state Legislature. In that case, the state offered to distribute surplus state funds to local governments to mitigate the impact of Proposition 13.[3] The Legislature, however, then enacted a special provision prohibiting the distribution of surplus state funds to any local agency that granted to its employees a cost-of-living wage or salary increase that exceeded the cost-of-living increase provided to state employees. At issue was whether the latter provision violated the home rule doctrine of the California Constitution. (Sonoma County, at pp. 314—318.) We emphasized in Sonoma County that the determination of what constitutes a municipal affair (over which the state has no legislative authority) and what constitutes a statewide concern (as to which state law is controlling) is a matter for the courts, not the Legislature, to decide. (Id. at p. 316, citing Bishop, supra, 1 Cal.3d 56.) Moreover, that the Legislature chose to deal with a problem on a statewide basis, Sonoma County said, does not in itself make the problem a statewide concern. (Sonoma County, at p. 316.) Put differently, the concept of statewide concern is not coextensive with the state’s police power. Citing numerous cases and an explicit provision of the state Constitution, Sonoma County concluded that the salaries of local employees of a charter city are a municipal affair not subject to the state’s general laws. {Id. at pp. 316-317.)
*563 Similarly, in San Francisco Labor Council v. Regents of University of California (1980) 26 Cal.3d 785 [163 Cal.Rptr. 460, 608 P.2d 277] (S.F. Labor Council), we rejected an effort by the state Legislature to compel The Regents of the University of California to pay prevailing wages to university employees. Under article IX, section 9 of the California Constitution, the University of California enjoys an autonomy like that of charter cities under article XI, section 5. Specifically, article IX, section 9 provides that the University of California shall have “full powers of organization and government,” subject only to a few narrow exceptions. Significantly, one of the exceptions pertains to state legislation that “regulates matters of statewide concern not involving internal university affairs.” (S.F. Labor Council, at p. 789, italics added.) Relying on Sonoma County, supra, 23 Cal.3d 296, we concluded that the state’s prevailing wage requirement was “not a matter of statewide concern.” (S.F. Labor Council, at p. 790.) We observed that “while the statute purports to establish a minimum wage, it in effect determines the wage.” (Ibid.) We then stated: “Although the Legislature has declared that the matter is one of statewide concern [citation], the declaration is not controlling ____” (Id. at pp. 790-791.)
As discussed above, Sonoma County, supra, 23 Cal.3d 296, involved the autonomy rights of charter cities and counties, and S.F. Labor Council, supra, 26 Cal.3d 785, applied Sonoma County’s holding to a case involving a state prevailing wage law analogous to the one at issue here. Read together, Sonoma County and S.F. Labor Council indicate our continued adherence to the holding in Charleville, supra, 215 Cal. 384, that charter cities are not subject to the state’s prevailing wage law.
More recently, in County of Riverside, supra, 30 Cal.4th 278, we reaffirmed that compensation of public employees is not a statewide concern justifying state law interference in the autonomy of independent governmental entities. We there concluded that state law could not force a county into binding arbitration over the compensation paid to county employees. Our decision applied two state constitutional provisions: one giving all counties authority to “provide for the . .. compensation ... of [their] employees” (Cal. Const., art. XI, § 1, subd. (b)), the other prohibiting the Legislature from “delegating] to a private person or body power to . . . interfere with county or municipal corporation . . . money” (id., § 11, subd. (a)). In the course of our analysis, we considered whether the state law at issue might be enforceable because it governed a matter of statewide concern. (County of Riverside, at pp. 286, 291.) We rejected the Legislature’s assertion that the matter involved a statewide concern. (Id. at pp. 286-287.) Instead, we concluded that the state law in question impinged too much on local rights, “depriving the county entirely of its authority to set employee salaries.” (Id. at p. 288; see id. at p. 293.) We also drew an important distinction between state procedural laws governing the affairs of local governmental entities (which *564 by their nature impinge less on local affairs) and state laws dictating the substance of a public employee labor issue (which impinge much more on local affairs). (Id. at p. 289.)
Although the three cases just cited—Sonoma County, supra, 23 Cal.3d 296, S.F. Labor Council, supra, 26 Cal.3d 785, and County of Riverside, supra, 30 Cal.4th 278—deal with the wages of public employees rather than, as here, the wages of private employees constructing local public works projects, the distinction is irrelevant. The Union’s arguments here do not depend on whether the workers constructing the public work are public or private employees. If, as the Union contends, the prevailing wage law’s shift from a purely local focus to a regional focus has made the wage levels of workers constructing locally funded public works a matter of statewide concern, then that would be true whether the case involved public employees or private employees. Similarly, if, as the Union asserts, the state’s economic integration during the 80 years since our 1932 decision in Charleville, supra, 215 Cal. 384, has made the wages of workers constructing local public works a matter of statewide concern, then that would be true for both public employees and private employees.
Significantly, this case is not like others in which we found a statewide concern to justify the application of a state law to charter cities. For example, our cases have suggested that a state law of broad general application is more likely to address a statewide concern than one that is narrow and particularized in its application. (S.F. Labor Council, supra, 26 Cal.3d at pp. 789-790; Charleville, supra, 215 Cal. at p. 390.) We applied this principle in People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach (1984) 36 Cal.3d 591, 600 [205 Cal.Rptr. 794, 685 P.2d 1145], and Professional Fire Fighters, Inc. v. City of Los Angeles (1963) 60 Cal.2d 276, 294-295 [32 Cal.Rptr. 830, 384 P.2d 158]. In the latter two cases, we also noted that the state laws at issue set forth generally applicable procedural standards, and consequently impinged less on local autonomy than if they had imposed substantive obligations. In Seal Beach, for example, we said: “[T]here is a clear distinction between the substance of a public employee labor issue and the procedure by which it is resolved. Thus there is no question that ‘salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws.’ ([Sonoma County], supra, 23 Cal.3d at p. 317.) Nevertheless, the process by which salaries are fixed is obviously a matter of statewide concern and none could, at this late stage, argue that a charter city need not meet and confer concerning its salary structure.” (Seal Beach, at pp. 600-601, fn. 11; see County of Riverside, supra, 30 Cal.4th at p. 289.)
Here, the state law at issue is not a minimum wage law of broad general application; rather, the law at issue here has a far narrower application, as it pertains only to the public works projects of public agencies. In *565 addition, it imposes substantive obligations on charter cities, not merely generally applicable procedural standards. These distinctions further undermine the Union’s assertion that the matter here presents a statewide concern and therefore requires Vista, a charter city, to comply with the state’s prevailing wage law on the city’s locally funded public works projects.
We are aware that the Legislature has recently stated that the wage levels of contract workers constructing locally funded public works are a matter of statewide concern. The Legislature’s view is expressed in two amendments to the prevailing wage law, one in 2002 and the other in 2003, each addressing a relatively narrow category of public works. Uncodified sections of both amendments state: “It is a matter of statewide concern that every public agency in California pay the prevailing rate of per diem wages to workers employed on public works projects undertaken by those public agencies.” (Stats. 2003, ch. 851, § 1, p. 6247, italics added; Stats. 2002, ch. 892, § 1, p. 5541, italics added; see Stats. 2002, ch. 868, § 1, p. 5455.) Likewise, a 2003 concurrent resolution of the Legislature stated in relevant part: “[T]he Legislature reaffirms its intent for the state prevailing wage law to apply broadly to all projects subsidized with public funds, including the projects of chartered cities, as the law addresses important statewide concerns . . . .” (Sen. Cone. Res. No. 49, Stats. 2003 (2003-2004 Reg. Sess.) res. ch. 135, pp. 6833-6834.)
But as we noted earlier (see pt. H.C., ante), the Legislature’s view as to what constitutes a statewide concern is not determinative in resolving the constitutional question before us. This court considered similar legislative findings in regard to the statute requiring The Regents of the University of California to pay prevailing wages, and the court concluded that those findings were not controlling. (S.F. Labor Council, supra, 26 Cal.3d at pp. 790-791; see County of Riverside, supra, 30 Cal.4th at pp. 286-287.) Although we give such statements by the Legislature great weight (Baggett v. Gates, supra, 32 Cal.3d at p. 136), the resolution of constitutional challenges to state laws falls within the judicial power, not the legislative power. (County of Riverside, at pp. 286-287; Sonoma County, supra, 23 Cal.3d at p. 316; Bishop, supra, 1 Cal.3d at p. 63.) “ ‘It is, emphatically, the province and duty of the judicial department, to say what the law is.’ ” (McClung v. Employment Development Dept. (2004) 34 Cal.4th 467, 469 [20 Cal.Rptr.3d 428, 99 P.3d 1015], quoting Marbury v. Madison (1803) 5 U.S. 137, 111 [2 L.Ed. 60]; see Lockyer v. City and County of San Francisco (2004) 33 Cal.4th 1055, 1068 [17 Cal.Rptr.3d 225, 95 P.3d 459].) Moreover, we are “especially” hesitant to abdicate to the Legislature’s view of the issue “when [as here] the issue involves the division of power between local government and that same Legislature.” (County of Riverside, at p. 286.)
*566 In this case, we conclude that no statewide concern has been presented justifying the state’s regulation of the wages that charter cities require their contractors to pay to workers hired to construct locally funded public works. In light of our conclusion that there is no statewide concern here, we need not determine whether the state’s prevailing wage law is “reasonably related to ... resolution” of that concern (California Fed. Savings, supra, 54 Cal.3d at p. 17) and is “narrowly tailored” to avoid unnecessary interference in local governance (id. at p. 24). The trial court here was correct to deny plaintiff Union’s petition for a writ of mandate, and the Court of Appeal properly affirmed the trial court’s judgment.
Disposition
We affirm the judgment of the Court of Appeal, which in turn affirmed the trial court’s judgment denying the Union’s petition for a writ of mandate.
Cantil-Sakauye, C. J., Baxter, J., Chin, J., and Corrigan, J., concurred.

 “ ‘The Government Code classifies cities as either “general law cities” (cities organized under the general law of California) or “chartered cities” (cities organized under a charter). [Citations.] ... [A] general law city . . . must comply with state statutes that specify requirements for entering into contracts. [Citations.]’ ” (City of Orange v. San Diego County Employees Retirement Assn. (2002) 103 Cal.App.4th 45, 52 [126 Cal.Rptr.2d 405].)

 The prevailing wage law replaced a law from the late 19th century that required payment of at least $2 per day for labor on public works. (Stats. 1897, ch. 88, § 1, p. 90.)

 Proposition 13, an initiative measure that the California electorate passed on June 6, 1978, added article XIII A to the California Constitution, placing significant limits on the taxing power of local and state governments.