Filed 11/3/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE ex rel. ROB BONTA, as Attorney General, etc., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF HUNTINGTON BEACH et al., <br><br> Defendants and Respondents. | G065589 <br><br> (Super. Ct. No. 30-2024-01393606) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Nick A. Dourbetas, Judge. Reversed and remanded with directions.

Rob Bonta, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Seth E. Goldstein and Michael S. Cohen, Deputy Attorneys General, for Plaintiffs and Appellants.

ACLU Foundation of Southern California, Peter Eliasberg and Julia Gomez for ACLU of Southern California, ACLU of Northern California,

and ACLU of San Diego and Imperial Counties as Amici Curiae on behalf of Plaintiffs and Appellants.

Cooley, Kathleen R. Hartnett, Matt K. Nguyen, Kristen Adrina Johnson and Ana Alicia Bordallo for Asian Americans Advancing Justice Southern California, Asian Law Caucus, California Black Power Network, and Disability Rights California as Amici Curiae on behalf of Plaintiffs and Appellants.

Michael J. Vigliotta, City Attorney; JW Howard/Attorneys, John W. Howard, Scott Street, Michelle Volk, Peter Shelling, and Mitchell Stein for Defendants and Respondents.[1]

Law Office of Chad Morgan and Chad D. Morgan for James V. Lacy, United States Justice Foundation, and California Public Policy Foundation as Amici Curiae on behalf of Defendants and Respondents.

*      *      *


THE COURT:*

In recent years, a vigorous nationwide debate has arisen over whether voters should be required to present identification at the polls to vote. Proponents of such a requirement contend it is necessary to protect against voter fraud and ensure the integrity of elections. Opponents argue it

---

[1] The American First Legal Foundation, James K. Rogers, Nicholas Barry, and Ryan Gianetti are also listed as counsel on the caption of the defendants' Brief. Rogers, Barry, and Giannetti are not licensed to practice law in the State of California and did not apply to this court for pro hac vice admission. The court declines to recognize them as counsel of record in this case.

* Before Motoike, Acting P. J., Sanchez, J., and Delaney, J.

2

is unnecessary in light of the extreme rarity of documented cases of voter fraud and harms electoral legitimacy by discriminating against historically disadvantaged groups for whom obtaining such identification is more difficult.

We are not called upon to resolve this debate. Instead, this case presents us a much narrower, simpler question: Is voter identification a matter of "'integrity of the electoral process,'" which our Supreme Court has held is a matter of statewide concern, whether presented in statewide or local elections? (*Johnson v. Bradley* (1992) 4 Cal.4th 389, 409.) We conclude it is, and that as a result Elections Code section 10005 preempts section 705, subdivision (a)(2) of the Huntington Beach City Charter, which purports to permit Huntington Beach to require voters to present identification to vote in municipal elections.

## STATEMENT OF FACTS

Huntington Beach (the City) is a charter city in Orange County. In 2023, the City Council placed on the ballot a measure to amend section 702 and add section 705 to the City Charter. (Voter Information Guide, Primary Elec. (Mar. 5, 2024) text of Measure A.) (Measure A.) The amendment to section 702 called for the City Charter's election rules to supersede the state Elections Code. The newly added section 705 stated (as relevant here): "(a) Beginning in 2026, for all municipal elections:" "(2) The City may verify the eligibility of Electors by voter identification." These two changes were packaged together as City of Huntington Beach Measure A on the ballot for the March 5, 2024 Presidential Primary ballot. Measure A passed by a total vote of 32,892 to 28,701.

3

In response, the Legislature enacted (and the Governor signed) Senate Bill No. 1174 (2023-2024 Reg. Sess.), which added section 10005 to the Elections Code. (Stats. 2024, ch. 990, § 2.) The newly enacted section, effective January 1, 2025, forbids any "local government" from "enact[ing] or enforc[ing] any charter provision, ordinance, or regulation requiring a person to present identification for the purpose of voting or submitting a ballot at any polling place, vote center, or other location where ballots are cast or submitted, unless required by state or federal law." (Elec. Code, § 10005.) The statute specifically defines the term "'local government'" as including "any charter or general law city . . . ." (*Ibid*.)

From its inception, Elections Code section 10005 was specifically intended to respond to Measure A. The bill was sponsored by the state senator representing the City. The reports prepared for the Legislature to discuss the bill specifically refer to Huntington Beach Measure A. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1174 (2023-2024 Reg. Sess.) as amended May 2, 2024.)

PROCEDURAL HISTORY

Within weeks of the passage of Measure A, the state (through the Attorney General and Secretary of State) filed a petition for a writ of mandate in the Orange County Superior Court against the City and its clerk. The state sought a writ of mandate invalidating section 705, subdivision (a)(2) of the City Charter, an injunction prohibiting its implementation or enforcement, and a judicial declaration that it is preempted by and violates California law.

The City demurred, arguing its voter identification requirement had not yet been implemented by a scheme of ordinances, such that a decision on the issue was not yet ripe, and because section 705 of the City Charter was not effective until January 2026. The trial court sustained the demurrer with leave to amend but the state declined to amend its petition and sought immediate entry of judgment to expedite appeal. The trial court, in turn, declined to enter judgment and ordered the petition dismissed without prejudice.

The state appealed and separately filed a petition for writ of mandate. This court issued a so-called "suggestive *Palma* notice," indicating its tentative conclusions that (1) the matter was ripe for decision, contrary to the trial court's ruling; (2) the trial court's refusal to enter judgment was erroneous; and (3) the trial court's orders were not separately appealable (meaning the trial court retained jurisdiction to alter its orders). The trial court then vacated its orders sustaining the City's demurrer and dismissing the petition and instead set the matter for hearing. This court then dismissed the state's writ petition and appeal.

After the hearing, the trial court denied the state's petition for a writ of mandate. The trial court concluded "the challenged charter provision does not violate the right to vote and does not implicate the integrity of the electoral process." The state timely appealed from the resulting judgment.

## DISCUSSION

### I.

### THE HOME RULE DOCTRINE

Under the California Constitution, charter cities like the City are "specifically authorized . . . to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building &*

5

*Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555; Cal. Const., art. XI, § 5.) This is sometimes known as the "home rule doctrine." (*State Building & Construction Trades Council of California*, at p. 555.) When state law and a charter city's regulations or ordinances conflict, we apply a four-factor test to determine whether the home rule doctrine permits or bars state law preemption. (*Id.* at p. 556.)

First, we analyze "whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair.'" (*State Building & Construction Trades Council of California v. City of Vista*, *supra*, 54 Cal.4th at p. 556.) Second, we consider whether the case presents an actual conflict between state and local law. (*Ibid.*) Third, we "decide whether the state law addresses a matter of 'statewide concern.'" (*Ibid.*) Fourth, we "determine whether the law is 'reasonably related to . . . resolution' of that concern [citation] and 'narrowly tailored' to avoid unnecessary interference in local governance." (*Ibid.*) "'If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5[, subdivision (a) of the California Constitution], from addressing the statewide dimension by its own tailored enactments.'" (*Ibid.*) Though we give great weight to the factual record compiled by the Legislature and any relevant facts established in the trial court, this is a question of law, not fact, to which we apply a de novo standard of review. (See *State Building & Construction Trades Council of California*, at p. 558.) Neither the trial court's nor the Legislature's factual findings are controlling. (*Ibid.*)

6

## II.

### APPLYING THE FOUR-PART "HOME RULE" TEST

A. *Parts One and Two: Is This a Municipal Affair and Is There an Actual Conflict Between State and Local Law?*

The first two parts of the test are easily resolved. First, municipal elections are a quintessentially municipal affair. (*Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781, 796.) Municipal elections are even specifically named as municipal affairs in the relevant section of our constitution. (Cal. Const., art. XI, § 5, subd. (b).)

Second, there is plainly an actual conflict between Elections Code section 10005 and section 705, subdivision (a)(2) of the City Charter. One expressly grants the City permission to conduct voter identification checks beyond those required by state and federal law, while the other forbids such checks. The City argues (as it did in its demurrer on the issue of ripeness) that it is not yet possible to know whether the City's ordinance will actually conflict with Elections Code section 10005. The City posits it might ultimately decide only to impose identical requirements to those imposed by state and federal law, such that no conflict exists. We find this argument unpersuasive in light of the nature of the City's amendments to its charter, which expressly purport to grant it authority not only to conduct voter identification checks, but also to do so in violation of the state Elections Code. We ordinarily presume the Legislature or other legislative bodies do not engage in idle acts. (*Gonzales v. California Victim Compensation Bd.* (2023) 98 Cal.App.5th 427, 445.)

7

*B. Part Three: Does the State Law Address a Matter of Statewide Concern?*

The third part of the test—whether the state law addresses a matter of statewide concern—was the basis for the trial court's decision. The trial court reasoned that this dispute "does not implicate the integrity of the electoral process" because the United States Supreme Court held in *Crawford v. Marion County Election Bd.* (2008) 553 U.S. 181 that voter identification requirements do not violate the right to vote under the Fourteenth Amendment. The trial court thus concluded there was no statewide concern at issue here, distinguishing *Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781 (*Jauregui*), in which the Court of Appeal for the Second District concluded a state law requiring the City of Palmdale to elect its city council members via districts rather than in a citywide vote addressed a matter of statewide concern because the state's rules were based on concerns about racial vote dilution. (*Id.* at pp. 800–801.)

The trial court's interpretation of *Jauregui* was erroneous. The *Jauregui* court's reasoning was not limited to issues arising under the Fourteenth Amendment or under the comparable provisions of article 1, section 2 of the California Constitution. (*Jauregui, supra*, 226 Cal.App.4th at p. 801.) Instead, "[e]ven if constitutionally mandated voting and equal protection concerns do not constitute a statewide interest, our Supreme Court has explained that integrity in the municipal electoral process is." (*Ibid.*) In other words, electoral integrity at the municipal level is a statewide concern reaching beyond the individual's constitutional right to vote. And, as the *Jauregui* court went on to explain, "Electoral results lack integrity where a protected class is denied equal participation in the electoral process . . . ." (*Ibid.*)

The state argues the City's voter identification requirements may interfere with the ability of eligible voters to cast their ballots by placing a practical and financial hurdle between voters and the ballot box. Therefore, the state argues, Elections Code section 10005 addresses election integrity by safeguarding the right of citizens to vote against unnecessary interference by municipalities.

On this point, amici curiae for the state provide useful historical context. They point out that the Legislature sought to prohibit voter identification requirements like the City's because the Legislature found they "have historically been used to disenfranchise low-income voters, voters of color, voters with disabilities, and senior voters." (Sen. Bill No. 1174 (2023-2024 Reg. Sess.) § 1, subd. (a)(4).) Amici for the state note that California (like many other states) has an unfortunate history of enacting facially neutral voting restrictions that had disparate effects on different groups of people—typically disfavoring low-income or minority voters. As examples, amici for the state point to California's recurrent re-registration requirements (wherein voters were required to travel to the county clerk's office to re-register to vote every two years), English literacy tests, and poll taxes, all of which were enacted in the 1800s. Poll taxes were later expressly banned by Congress in the Voting Rights Act of 1965 (see 52 U.S.C. § 10306) and English-only elections or literacy tests were forbidden by a 1975 amendment thereto (see 52 U.S.C. § 10303(f)). The California Supreme Court also struck down California's English literacy voting requirement in 1970, citing the Fourteenth Amendment. (*Castro v. State of California* (1970) 2 Cal.3d 223.)

These examples amply demonstrate the weight of the state's interest in regulating (and, where possible, eliminating) barriers to voting.

9

The state must strike a careful balance between, on the one hand, ensuring that only eligible voters are able to vote in elections while, on the other hand, not discouraging or preventing disadvantaged voters and communities from participating in the political process. Permitting the City to make its own rules, in violation of the state Elections Code, would upset the state's delicate balance and could impugn the integrity of the City's elections.

The City's arguments to the contrary are unpersuasive. The City does not discuss (or even cite) *Jauregui*. Instead, the City obliquely references *Jauregui* by arguing its voter identification requirement can only help secure the integrity of its elections because it "denies no person who is qualified and authorized to vote[] the right and power to do so." As described above, each additional barrier to voting, even if facially neutral, has the well-documented effect of discouraging certain voters—voters who are fully qualified and authorized to vote—from participating in the political process. As amici for the state explained and the Legislature found, these effects have historically fallen disproportionately on low-income voters, voters of color, voters with disabilities, and seniors.

Accordingly, we conclude Elections Code section 10005 addresses a matter of statewide concern.

## C. Part Four: Is the State Law Narrowly Drawn and Reasonably Related to the Statewide Issue?

The trial court did not reach the fourth part of the test: whether the state law is narrowly drawn and reasonably related to the statewide issue it addresses. This issue, as part of the home rule analysis, is ultimately legal rather than factual, which allows us to reach a decision instead of remanding for a new trial. (*State Building & Construction Trades Council of California v. City of Vista, supra*, 54 Cal.4th at p. 558.)

10

Elections Code section 10005 is reasonably related to the statewide issue it addresses: election integrity. It prevents the State's political subdivisions from enacting or enforcing voter identification requirements beyond those required by state or federal law. In so doing, it preserves the State's careful balance of competing interests, ensuring elections are secure from voter fraud while minimizing potentially discriminatory barriers to voting. The statute is also narrowly tailored, as it regulates only the narrow category of voter identification checks. Neither the City nor its amici argue the statute fails this part of the test.

III.

THE OTHER ARGUMENTS RAISED BY AMICI FOR THE CITY LACK MERIT

Amici for the City offer two other arguments, both of which we also reject. First, amici for the City contend article XI, section 5 of the California Constitution grants charter cities complete authority over municipal elections, even overriding any contrary state law, so long as the charter city's rules do not violate the California or United States Constitutions. Amici for the City would not have us apply the ordinary four-factor test at all, pointing to the language of article XI, section 5, subdivision (b)(4) that gives charter cities "plenary authority" over "the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, . . . and for their compensation . . . ." Amici for the City would also have us depart from *Jauregui* on this point, arguing it is wrongly decided.

However, this argument was squarely rejected by the California Supreme Court in *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 599–600, in which the court explained that

11

despite the use of the word "'plenary'" in this context, "'general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern.'" (*Id.* at p. 600.) Amici for the City suggest a contrary rule may be found in *Johnson v. Bradley* (1992) 4 Cal.4th 389, 401–404, but at most the Supreme Court's discussion of this issue in that case is dicta because the court ultimately applied the ordinary four-factor test. (*Id.* at pp. 398–411.)

Second, amici for the City argue *Lacy v. City and County of San Francisco* (2023) 94 Cal.App.5th 238 (*Lacy*) supports the City's position. Amici for the City characterize the City's voter identification requirement as a modification of voter qualifications—only those voters who can present identification are qualified to vote.[2] Amici for the City then argue the *Lacy* court concluded charter cities had the authority to determine voter qualifications. Thus, amici for the City contend, the City has authority to determine that only voters who can present identification are qualified to vote.

In *Lacy*, the First District Court of Appeal considered a challenge to a proposition passed in the City and County of San Francisco (both a charter city and a charter county) allowing resident noncitizen parents or guardians of children living in San Francisco to vote in local school board elections. (*Lacy*, *supra*, 94 Cal.App.5th at p. 243.) The challengers (who included amici for the City) argued the proposition violated the California

---

[2] We cannot help but note the contradiction between amici for the City's argument that the City is disqualifying only those voters who do not possess the required identification from voting and the City's own argument that its voter identification requirement does not deny any qualified voter access to the polls.

Constitution and Elections Code. (*Lacy,* at p. 244.) The court concluded the California Constitution permitted charter cities to *expand* the range of people who may vote in local board elections to include noncitizen parents or guardians of local children. (*Lacy,* at p. 260.) As to state statutes, the court found the challenged proposition did not conflict with state law, which granted charter cities and counties the ability to depart from statewide procedures in conducting school board elections. (*Ibid.*)

On the "voter qualification" issue pressed by amici for the City, *Lacy* is, at best, distinguishable, and at worst holds the opposite. The *Lacy* court explained that the dispute between the parties in that case was whether article II, section 2, subdivision (a) of the California Constitution[3] established *both* a floor and a ceiling for voter qualifications or (as San Francisco contended) merely a floor.[4] (*Lacy, supra,* 94 Cal.App.5th at pp. 245–249.) In other words, the parties in *Lacy* agreed, at least impliedly, that article II, section 2, subdivision (a) of the California Constitution *forbade* narrowing the electorate by imposing additional voter qualifications, while amici for the City argues *Lacy* requires us to hold the state cannot prevent a charter city from doing so. Moreover, the *Lacy* court was at pains to disclaim

_____

[3] "A United States citizen 18 years of age and resident in this State may vote." (Cal. Const., art. II, § 2, subd. (a).)

[4] The *Lacy* court's use of the terms "floor" and "ceiling" on voter qualifications is somewhat confusing. A "floor for voter qualifications," read literally, suggests voter *qualifications* may be added but not removed, while a "ceiling" suggests such qualifications may be removed but no new ones added. However, from context it is clear the court meant a "floor" and "ceiling" on the electorate, such that a "floor" means the electorate can be expanded but not narrowed, while a "ceiling" means the electorate can be narrowed but not expanded.

the conclusion amici for the City ask us to reach: "Similarly, as [the San Francisco proposition] expanded the franchise, we do not opine on charter cities' ability to narrow it." (*Lacy*, *supra*, 94 Cal.App.5th at p. 260.) And, of course, unlike in this case, the *Lacy* court found no conflict between state law and San Francisco's new proposition, meaning the primary question we face in this case was simply not raised in *Lacy*.

Next, on the "plenary" authority argument separately advanced by amici for the City, *Lacy* undermines amici's position. The *Lacy* court explained the "'plenary'" language was added to the Constitution in 1914 to "address the issue of '"bulky charters"' resulting from previous judicial constructions finding 'laws regulating municipal elections and compensation of municipal officers . . . could be given no effect if the city charter was silent on that subject.'" (*Lacy*, *supra*, 94 Cal.App.5th at p. 258.) Thus, while amici for the City contend the purpose of the word "plenary" was to immunize charter cities and counties from state law even on questions of statewide importance, the history of its addition to the Constitution suggests its purpose was to address situations in which the city charter was silent, not to limit state authority.

## III.

### CONCLUSION

Having concluded Elections Code section 10005 passes the four-part "home rule" test (which we conclude is the applicable test), we hold Elections Code section 10005 preempts section 705, subdivision (a)(2) of the Huntington Beach City Charter.

14

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to (1) issue a writ of mandate invalidating section 705, subdivision (a)(2) of the Huntington Beach City Charter and directing defendants to cease its implementation or enforcement; (2) enter a permanent injunction barring defendants from implementing or enforcing section 705, subdivision (a)(2) of the Huntington Beach City Charter; and (3) issue a declaratory judgment that section 705, subdivision (a)(2) of the Huntington Beach City Charter is preempted by and violates California law.

Plaintiffs shall recover their costs on appeal.