WERDEGAR, J., Dissenting.
This case requires that we resolve a dispute between the Legislature and a charter city, two entities granted specific lawmaking authority by our state Constitution. On the one hand, “[t]he legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly . . . .” (Cal. Const., art. IV, § 1.) The state Legislature wields “the entire law-making authority of the state, except the people’s right of initiative and referendum” and “may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution.” (Methodist Hosp. of Sacramento v. Saylor (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].) On the other hand, under what is alternately called the “municipal home rule” or “municipal affairs” doctrine, charter cities are empowered to “make and enforce all ordinances and regulations in respect to municipal affairs,” and such ordinances “shall supersede all laws inconsistent therewith.” (Cal. Const., art. XI, § 5, subd. (a).)
In this case, the Legislature exercised its lawmaking powers to enact sections 1720 to 1861 of the Labor Code, commonly referred to as the prevailing wage law, which generally requires payment of the prevailing wage to workers on publicly funded construction projects. By contrast, defendant City of Vista (Vista), a charter city, exercised its lawmaking powers to enact an ordinance that (in most instances) prohibits city contracts from requiring the payment of the prevailing wage. In this area of overlapping lawmaking authority, a constitutional tension exists.
This court is the final arbiter of the meaning of the California Constitution. Unlike when we interpret state statutory law or federal constitutional law, *567 where our decisions can be overturned by, respectively, the Legislature or the United States Supreme Court, we are the last word on the meaning of the state Constitution. If we err, our decision can be corrected only by an amendment to that Constitution. Accordingly, when approaching a dispute between the Legislature and a charter city under the municipal affairs doctrine, we are charged with a solemn and delicate obligation to fairly balance conflicting interests and reasonably resolve the tension inherent in such disputes.
The majority’s approach to this case is neither fair nor reasonable. Instead, the majority goes astray by making a series of analytical missteps. First, in concluding Vista’s ordinance comes within the protected zone of municipal affairs, the majority places unjustified weight on Vista’s fiscal interest in saving money on the construction of public buildings, and relies on an outmoded “Depression Era” decision that interpreted a different law (maj. opn., ante, at pp. 558-559) long ago eclipsed by more modem economic ideas.
Second, by failing to appreciate the full impact of the prevailing wage law, the majority significantly undervalues the statewide economic concerns the law addresses, and fails to accord appropriate weight to the Legislature’s express findings and declarations that the prevailing wage law should apply to charter cities and that it addresses a matter of statewide concern. Finally, the majority fails to recognize the difference—critical in the context of municipal governance and independence—between state regulations affecting public employees and those affecting private employees who contract with the city.
For these reasons, I dissent.
I. Discussion
As the majority recognizes, we resolve disputes over the scope of the municipal affairs doctrine by applying the test set forth in California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916] (California Fed. Savings). Preliminarily, we ask whether a charter city’s exercise of legislative power falls within the zone of its municipal affairs and, if so, whether compliance with the local ordinance conflicts with state law. If a court determines that a local law addresses a matter within the municipal affairs of the charter city and that it conflicts with a state law, the court must then decide whether the state law addresses a matter of “statewide concern”—what the California Fed. Savings court termed “the bedrock inquiry through which the conflict between state and local interests is adjusted.” (Id. at p. 17.) “If the subject of the statute fails to *568 qualify as one of statewide concern, then the conflicting charter city measure is a ‘municipal affair’ and ‘beyond the reach of legislative enactment.’ ” (Ibid.) But if “the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution, then the conflicting charter city measure ceases to be a ‘municipal affair’ pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments.” (Ibid.)
Requiring a showing of “statewide concern” as a condition of “state legislative supremacy” requires the state to articulate a dimension to the state law that “demonstrably transcend[s] identifiable municipal interests.” (California Fed. Savings, supra, 54 Cal.3d at p. 17.) This in turn tends to ensure that “areas which are of intramural concern only” will not be invaded by the state, thereby “preserving core values of charter city government.” (Ibid.)
As the majority acknowledges, the issue we decide today is a legal, not a factual, one (maj. opn., ante, at p. 558), and in resolving it we must undertake an evaluation of the facts and circumstances of each individual case, exercising independent review. {California Fed. Savings, supra, 54 Cal.3d at p. 24, fn. 21.) “[T]he Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern.” (Bishop v. City of San Jose (1969) 1 Cal.3d 56, 63 [81 Cal.Rptr. 465, 460 P.2d 137].) “[W]hat constitutes a matter of statewide concern is ultimately an issue for the courts to decide . . . .” (Baggett v. Gates (1982) 32 Cal.3d 128, 136 [185 Cal.Rptr. 232, 649 P.2d 874].) So too, a city’s claim that some matter falls within the protected zone of the municipal affairs doctrine will be decided not by the city, but by the courts.
A. Does Vista’s Ordinance Come Within the Protected Zone of Municipal Affairs?
The majority asserts that “[t]he wage levels of contract workers constructing locally funded public works are certainly a ‘municipal affair.’ ” (Maj. opn., ante, at p. 558.) No citation to authority is required to conclude that the provision and financing of a proper city infrastructure, whether it be housing, hospitals, libraries or other civic buildings, is the business of a city, chartered or otherwise. Vista has imposed a citywide sales tax increase to pay for the cost of the design, construction and renovation of some of its civic buildings. That these costs are to be borne by Vista alone, and not shared by the state, is a significant factor in favor of finding the public works at issue fall within the municipal affairs doctrine. (See Southern California Roads Co. v. McGuire (1934) 2 Cal.2d 115, 121-122 [39 P.2d 412] [because “the entire cost” of an *569 improvement to Sepulveda Blvd. in Los Angeles “is to be met and defrayed by the state,” the road project is not strictly a municipal affair of the city].)
The question, however, is not whether the design and physical construction of Vista’s civic buildings constitute a municipal affair, as they do, but whether Vista’s choice not to require the private construction firms with which it has contracted (or will contract) to pay the state prevailing wage to its construction worker employees is also a matter within the city’s municipal affairs. Vista contends a charter city’s internal fiscal affairs, including labor and employment issues, necessarily fall within the municipal home rule doctrine. Of relevance is section 5, subdivision (b) of article XI of the California Constitution, which provides a nonexclusive list of the types of matters falling within the municipal home rule doctrine. That section provides: “It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees.”
In light of this constitutional provision, the salary level of the mayor and city council members clearly falls within a city’s municipal affairs, as does the compensation level of the “city police force” as well as those city employees involved in the “subgovernment in all or part of a city” such as “deputies, clerks and other employees.” (Cal. Const., art. XI, § 5, subd. (b), italics added; see Bishop v. City of San Jose, supra, 1 Cal.3d 56 [the Legislature did not intend the prevailing wage law to apply to electricians employed as city workers]; Sonoma County Organization of Public Employees v. County of Sonoma (1979) 23 Cal.3d 296, 314-318 [152 Cal.Rptr. 903, 591 P.2d 1] [a state law precluding a salary increase for city and county employees violated the home rule provisions of the state Const.].)
But the more removed workers are from the heart of city government, the less the city’s legitimate interest in controlling their compensation. This case, for example, involves no Vista employee. Vista has contracted (or intends to contract) with private design and construction firms, which in turn have hired (or will hire) private construction workers, who will be paid not by Vista but by the construction firms. If a firm underbids the project, it is the firm, not the *570 city, that must still pay the workers. Accordingly, these contract workers cannot fairly be characterized as city employees who are necessary to maintain the “subgovernment in all or part of a city” (Cal. Const., art. XI, § 5, subd. (b), item (2)), nor considered “deputies, clerks and other employees” of the city (id., item (4)).
To reach its conclusion that Vista’s zone of protected municipal affairs nevertheless includes the wages of private construction workers, the majority relies uncritically on City of Pasadena v. Charleville (1932) 215 Cal. 384 [10 P.2d 745] (Charleville). Charleville involved the Public Wage Rate Act of 1931 (PWRA of 1931), a law of significantly less scope and statewide impact than the modem prevailing wage law at issue in this case. More importantly, Charleville’’ s reasoning has been overtaken by history. In Charleville the court explained that the PWRA of 1931 was a law of limited scope because it did not “purport to fix or provide for the fixation of the wage to be paid under all employment contracts, public and private” (Charleville, at p. 390, italics added) and suggested that an act purporting to impose a broader, statewide regulation on wages would have encountered “difficulties of constitutional questions” (ibid., citing Adkins v. Children’s Hospital (1923) 261 U.S. 525 [67 L.Ed. 785, 43 S.Ct. 394] [which invalidated a D.C. law imposing a minimum wage for women and minors]). Adkins was a notable exemplar of the late Lochner[1] period in which the high court extolled the virtues of the freedom to contract over nearly all other freedoms. As is well known, the principles animating that bygone era of constitutional jurisprudence were thereafter repudiated by the United States Supreme Court, and Adkins itself was specifically overruled in West Coast Hotel Co. v. Parrish (1937) 300 U.S. 379, 400 [81 L.Ed. 703, 57 S.Ct. 578]. (See generally Birkenfeld v. City of Berkeley (1976) 17 Cal.3d 129, 155-156 [130 Cal.Rptr. 465, 550 P.2d 1001].)
Contrary to Charleville’s premise that the United States Constitution prohibited state legislatures from imposing a minimum wage law, that the California Legislature may provide for minimum wages for workers is now firmly established. (Cal. Const., art. XIV, § 1 [“The Legislature may provide for minimum wages and for the general welfare of employees . . . .”].) Accordingly, whether a state may enforce laws such as the prevailing wage law to address matters of statewide concern has been untethered from the artificially created constitutional constraints of the Lochner era.
In light of this erosion of the legal assumptions underlying Charleville, supra, 215. Cal. 384, and because the PWRA of 1931 was markedly less extensive than the modem prevailing wage law, Charleville cannot be considered persuasive today. Moreover, given the obvious changes to our state’s economy since 1932 when Charleville was decided, i.e., its growth *571 and interdependence, the case was long ago eclipsed by more modem economic ideas. Common sense dictates that we abandon Charleville as precedent and consign it to the dustbin of history. (See Pac. Tel. & Tel. Co. v. City & County of S. F. (1959) 51 Cal.2d 766, 771 [336 P.2d 514] [“What may at one time have been a matter of local concern may at a later time become a matter of state concern controlled by the general laws of the state.”].)
Because Vista’s interest in controlling the wages of private contract workers is much less than its interest in dictating wage levels of its own employees, and absent the legitimizing effect of Charleville, supra, 215 Cal. 384, as precedent, the sole remaining consideration supporting Vista’s assertion of its municipal autonomy is its desire to save money on its planned public works projects. Every government, state or local, naturally has an interest in conserving public funds. But this general desire is insufficient of itself to invoke the municipal affairs doctrine. Were it otherwise, no state law could ever prevail over local desires, for all conflicting state laws have the potential to increase a city’s costs, whether it be to allow a city’s firefighters to unionize (Professional Fire Fighters, Inc. v. City of Los Angeles (1963) 60 Cal.2d 276 [32 Cal.Rptr. 830, 384 P.2d 158]), require cities to meet and confer in good faith with employee representatives regarding wages and hours (People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach (1984) 36 Cal.3d 591 [205 Cal.Rptr. 794, 685 P.2d 1145]), or give peace officers an administrative appeal before demoting them (Baggett v. Gates, supra, 32 Cal.3d 128). Vista must point to more than a ledger sheet to justify its contention that its ordinance falls within the municipal affairs doctrine.
. B. Does the Prevailing Wage Law Address a Matter of Statewide Concern?
The relative strength of Vista’s interest in preserving its public fisc aside, the crux of this case is the majority’s conclusion that the prevailing wage law fails to address a matter of statewide concern. (Maj. opn., ante, at p. 566.) In reaching that conclusion, the majority disregards the prevailing wage law’s far-reaching economic impact on our state economy. The Legislature has recognized the scope of the prevailing wage law’s statewide effect, having explicitly declared its intent in 2002 that “[p]ayment of the prevailing rate of per diem wages to workers employed on public works projects is necessary to attract the most skilled workers for those projects and to ensure that work of the highest quality is performed on those projects” (Stats. 2002, ch. 892, § 1, subd. (a)(1), p. 5541), that “[p]ublic works projects should never undermine the wage base in a community, and requiring that workers on public works projects are paid the prevailing rate of per diem wages ensures that wage base is not lowered” (id., subd. (a)(2)), and that it is a matter of “statewide concern” that public works undertaken by public agencies pay workers the *572 prevailing wage (id., subd. (a)(3)). A year later, in a 2003 concurrent resolution, the Legislature addressed the prevailing wage law specifically with regard to charter cities, declaring that “the state prevailing wage law [should] apply broadly to all projects subsidized with public funds, including the projects of chartered cities, as the law addresses important statewide concerns . . . .” (Sen. Cone. Res. No. 49, Stats. 2003 (2003-2004 Reg. Sess.) res. ch. 135, pp. 6833, 6834, italics added.)
These legislative statements are entitled to great weight (California Fed. Savings, supra, 54 Cal.3d at p. 24, fn. 21 [give “ ‘great weight’ ” to “legislative statements of purpose”]; Bishop v. City of San Jose, supra, 1 Cal.3d at p. 63 [same]), a rule the majority acknowledges (maj. opn., ante, at pp. 565-566) but fails to honor.
Even aside from the Legislature’s considered views, that the prevailing wage law addresses substantial statewide concerns that would be undermined were charter cities allowed to opt out of the law is not a close question. As a general matter, we have held that the promotion of uniform fair labor standards is an important statewide concern sufficient to override local prerogatives. For example, we held in People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach, supra, 36 Cal.3d 591, that the meet-and-confer provision of the Meyers-Milias-Brown Act (MMBA) (Gov. Code, § 3505) was enforceable against the City of Seal Beach, a charter city, despite its city charter amendment providing, among other things, for the immediate termination of any city employee who participated in a labor strike. We noted that one of the purposes of the MMBA was “to improve personnel management and employer-employee relations within the various public agencies” (Seal Beach, at p. 597), and that “[t]he meet-and-confer requirement is an essential component of the state’s legislative scheme for regulating the city’s employment practices” (id. at p. 599). As such, that state interest outweighed the city’s admitted power—authorized by the state Constitution under article XI, section 3, subdivision (b)—to amend its city charter.
Similarly, in Professional Fire Fighters, Inc. v. City of Los Angeles, supra, 60 Cal.2d 276, the City of Los Angeles, a charter city, argued that application of Labor Code section 1960,[2] which guarantees firefighters the right to join a union, addressed a matter of “purely local concern,” and that prior case law had held “that all matters connected with public employment in a chartered city are municipal affairs [citations].” (Professional Fire Fighters, at p. 291.) This court rejected the argument, explaining that an examination of the Legislature’s intent when enacting section 1960 and several related statutes *573 revealed “the Legislature was attempting to deal with labor relations on a statewide basis.” (Professional Fire Fighters, at p. 294.) By enacting those state laws, the Legislature “adopted general policies and provided general rights and obligations of labor and management throughout the state.” (Ibid.., italics added.) “The total effect of all this legislation was not to deprive local government (chartered city or otherwise) of the right to manage and control its fire departments but to create uniform fair labor practices throughout the state. As such, the legislation may impinge upon local control to a limited extent, but it is nonetheless a matter of state concern.” (Id. at pp. 294-295, italics added, quoted with approval in Baggett v. Gates, supra, 32 Cal.3d at p. 139.) “Labor relations are of the same statewide concern as workmen’s compensation, liability of municipalities for tort, [and] perfecting and filing of claims . . . , all of which have been held to be governed by general law in contravention of local regulation by chartered cities.” (Professional Fire Fighters, at p. 295.)
The prevailing wage law is to the same effect. Article XIV of the California Constitution is entitled “Labor Relations.” Section 1 of that article provides that “[t]he Legislature may provide for minimum wages and for the general welfare of employees . . . .” The Legislature is thus granted specific constitutional authority to address labor issues on a statewide scale. It exercised that power by enacting the Labor Code, providing expressly that “[i]t is the policy of this state to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards.” (Lab. Code, § 90.5, subd. (a).)
By first enacting the PWRA in 1931, and then replacing it a few years later with the much expanded prevailing wage law, the Legislature created an economic framework, applicable throughout the state, protecting Californians who work in the construction trades and, by extension, the viability of the construction industry as a whole. “The overall purpose of the prevailing wage law is to protect and benefit employees on public works projects.” (Lusardi Construction Co. v. Aubry (1992) 1 Cal.4th 976, 985 [4 Cal.Rptr.2d 837, 824 P.2d 643].) “This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees.” {Id. at p. 987, quoted *574 with approval in City of Long Beach v. Department of Industrial Relations (2004) 34 Cal.4th 942, 949 [22 Cal.Rptr.3d 518, 102 P.3d 904].)
The evolution of the modem prevailing wage law strongly supports the Legislature’s considered view that the wages paid on publicly funded construction projects impacts more than local concerns. As the majority recognizes (maj. opn., ante, at pp. 560-562), wage schedules are now established at the state rather than the local level, and the state Director of the Department of Industrial Relations considers wage levels throughout regional economies instead of focusing on a particular locality. This “trend toward economic regionalization” (maj. opn., ante, at p. 561) makes sense in the modem, post-1932 world (see dis. opn., ante, at p. 570) where, as an expert for plaintiff State Building and Construction Trades Council of California, AFL-CIO (SBCTC) testified below, construction workers travel many miles from their homes to jobsites in the region. To allow Oakland to pay construction workers significantly less than Berkeley, or Anaheim less than Santa Ana, would logically create downward pressure on wages[3] throughout the respective regions, leading to an economic race to the bottom, as contractors—union and nonunion—scramble to underbid competitors for construction contracts. When wages are sufficiently depressed, workers leave the construction trades, requiring California, when the state’s economy is flush and construction projects could flourish, to import skilled construction workers from outside the state. That situation negatively affects not just a city’s local economy, but California’s state economy as a whole.
The prevailing wage law supports the statewide economy in a second way, mentioned but discounted by the majority (maj. opn., ante, at pp. 560-562), requiring contractors on public works projects to participate in a statewide apprenticeship program. This program allows apprentices in the construction trades to learn on the job, ensuring the state will be supplied with a steady stream of skilled and semiskilled workers in the construction industry. “Between April and June 1994, California had 175 joint apprenticeship *575 programs . . . (California Div. of Labor Standards Enforcement v. Dillingham Constr, N. A., Inc. (1997) 519 U.S. 316, 327, fn. 5 [136 L.Ed.2d 791, 117 S.Ct. 832].) According to SBCTC’s expert, “[m]ore than 50,000 men and women are currently indentured in State-approved apprenticeship programs in the construction trades in California.” The Legislature has declared that “apprenticeship programs are a vital part of the educational system in California” (Stats. 1999, ch. 903, § 1, pp. 6605-6606) and that “[t]he state’s system for promoting quality apprenticeship training in the construction trades depends upon the incentives provided by the prevailing wage law” (Sen. Cone. Res. No. 49, Stats. 2003 (2003-2004 Reg. Sess.) res. ch. 135, pp. 6833, 6834).
Allowing charter cities to opt out of the prevailing wage law undermines this program by affording them the benefit of it (by using workers trained in state apprenticeship programs) without their paying for the privilege. In his declaration below, SBCTC’s expert explained: “Because of the unstable nature of construction-industry employment, a particular contractor might not be willing to invest the resources in training an apprentice for a multi-year period and might not be able to expose individual apprentices to all the different work processes necessary to become a journey-level worker in the craft. The current system of multi-employer apprenticeship programs allows the industry to share the costs, burdens and rewards of training new workers. The success of apprenticeship programs is vital to training the next generation of skilled construction workers in California.”
“The prevailing wage law bolsters the State’s apprenticeship training system by requiring contractors on public work who employ workers in apprenticeable crafts to use apprentices from state-approved programs to meet a specified minimum ratio of apprentice hours to journeyperson hours. The contractors are permitted to pay these apprentices at a lower wage rate. In this way, the prevailing wage law provides employment for apprentices so they can obtain the necessary on-the-job training in a variety of work processes to graduate from the programs.” “Absent the prevailing wage law, contractors that invest in apprenticeship training would find themselves at a competitive disadvantage to contractors that do not invest in apprenticeship training. Non-participating contractors could seek to hire apprenticeship-program graduates without having contributed to the cost of their training.”
Against the considerable weight of the evidence that the prevailing wage law addresses an issue of statewide concern, the majority’s answer is not to engage the issue, but to reframe the question. The majority thus asserts that the question is not whether regional labor standards and apprenticeship programs address an issue of statewide concern, but whether “the state can require a charter city to exercise its purchasing power in the construction *576 market in a way that supports regional wages and subsidizes vocational training, while increasing the charter city’s costs.” (Maj. opn., ante, at pp. 561-562.) What this reframing ignores is that the entire premise of the dispute before us, and the one that has continued to vex courts over the years, is that the state can sometimes override a city’s local choices—even financial ones—so long as it has sufficient reason (i.e., with a state law addressed to strong statewide concerns).
Moreover, in focusing narrowly on Vista’s costs, the majority fails to adhere to the California Fed. Savings test that requires us to use a wide-angle lens, cautioning that “courts should avoid the error of ‘compartmentalization,’ that is, of cordoning off an entire area of governmental activity as either a ‘municipal affair’ or one of statewide concern.” (California Fed. Savings, supra, 54 Cal.3d at p. 17.) Thus, while the effect of the prevailing wage law, as the majority laments, may be that Vista and other charter cities pay more for their public works projects, the purpose of the prevailing wage law, which the majority ignores, is not to make them pay more but to stabilize and support the construction trades. The latter is unquestionably a matter of substantial statewide concern.
Finally, in reframing the question, the majority gives the prevailing wage law a cramped and limited construction, failing to appreciate the sweeping nature of the legislation and viewing it instead as an unwarranted control on local spending priorities. But courts must give the prevailing wage law a liberal construction so that the general purpose and goals of the law are not defeated. (City of Long Beach v. Department of Industrial Relations, supra, 34 Cal.4th at p. 950; McIntosh v. Aubry (1993) 14 Cal.App.4th 1576, 1589 [18 Cal.Rptr.2d 680] [“Courts will liberally construe prevailing wage statutes ....”]; State Building & Construction Trades Council of California v. Duncan (2008) 162 Cal.App.4th 289, 324 [76 Cal.Rptr.3d 507] [same].)
Having reframed the issue to be decided, the majority asserts the case is controlled by Sonoma County Organization of Public Employees v. County of Sonoma, supra, 23 Cal.3d 296, San Francisco Labor Council v. Regents of University of California (1980) 26 Cal.3d 785 [163 Cal.Rptr. 460, 608 P.2d 277], and County of Riverside v. Superior Court (2003) 30 Cal.4th 278 [132 Cal.Rptr.2d 713, 66 P.3d 718]. (Maj. opn., ante, at pp. 562-564.) But one key factor distinguishes those cases: all involved the wages of (or labor disputes involving) a public entity’s actual employees. While the municipal home rule doctrine is concerned with state intrusion into the affairs of cities, and the state Constitution specifically mentions certain city employees (Cal. Const., art. XI, § 5, subd. (b)), neither the home rule doctrine nor the three cases cited have much to say about those not employed by the city.
*577 Unlike the public employees involved in Sonoma County, San Francisco Labor Council, and County of Riverside, the workers affected by the instant case are not, and cannot be considered, Vista’s employees. They are workers in the construction trades—electricians, plumbers, roofers, landscapers, carpenters—who presumably have traveled from many areas in the region, and who have been, or will be, hired by the construction firms the city has engaged or will engage. None of the trio of cases cited by the majority undermines the conclusion that the prevailing wage law addresses a matter of substantial statewide concern for those not employed by charter cities, counties or the state’s public universities.
The majority inexplicably finds this key factor “irrelevant.” (Maj. opn., ante, at p. 564.) But a charter city’s power to control the compensation of its employees, especially those integral to municipal governance, is expressly recognized by the state Constitution. (Cal. Const., art. XI, § 5, subd. (b).) The compensation of private contract workers is not.
II. Conclusion
The California Legislature long ago decided that stabilizing the construction trades and ensuring a steady supply of skilled and semiskilled workers in those trades was beneficial to our state’s long-term economic health. Accordingly, the Legislature, like many other states,[4] the federal government,[5] and even some cities,[6] enacted a prevailing wage law, requiring public entities to *578 pay the prevailing wage in the region to construction workers who toil on publicly funded construction projects. Allowing charter cities[7] to opt out of the constraints of that state law—not for any reason touching on municipal governance or independence, but simply to save the city money—seriously undermines the goals of the prevailing wage law and is contrary to the explicit intent of the Legislature.[8] Even were the issue close, which it is not, applicable precedent requires this court to err on the side of upholding state power. “There must always be doubt whether a matter which is of concern to both municipalities and the state is of sufficient statewide concern to justify a new legislative intrusion into an area traditionally regarded as ‘strictly a municipal affair.’ Such doubt, however, ‘must be resolved in favor of the legislative authority of the state.’ ” (Baggett v. Gates, supra, 32 Cal.3d at p. 140, quoted with approval in California Fed. Savings, supra, 54 Cal.3d at p. 24.)
Because the majority mistakenly characterizes Vista’s interest in saving money on its construction projects as falling within the municipal affairs doctrine, and concomitantly fails to accord sufficient weight to the obvious statewide economic interests served by the prevailing wage law, I dissent.
Liu, 1, concurred.

 See Lochner v. New York (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539].

 “Neither the State nor any county, political subdivision, incorporated city, town, nor any other municipal corporation shall prohibit, deny or obstruct the right of firefighters to join any bona fide labor organization of their own choice.” (Lab. Code, § 1960.)

 The prevailing wage law affects more than just wages. As SBCTC’s expert stated below: “Throughout the State, local craft unions and district labor councils have negotiated master labor agreements with contractors’ associations that establish wages, fringe benefits and other terms of employment. These collective bargaining agreements provide for uniform hourly wages, regardless of the contractor that is employing the worker, and require contractors to contribute to the same multi-employer benefits plans, so workers will enjoy health care and pension benefits notwithstanding the lack of continuous employment with a single contractor. This labor relations structure enables signatory contractors to respond to fluctuating demands for labor and enables construction workers to maintain steady employment and to receive health and pension benefits that protect them and their families.” (See Lab. Code, § 1773.1, subd. (a) [per diem wages under the prevailing wage law “shall be deemed to include employer payments for” health and welfare, pension, and vacation benefits]; see also Franchise Tax Bd. v. Laborers Vacation Trust (1983) 463 U.S. 1, 4, fn. 2 [77 L.Ed.2d 420, 103 S.Ct. 2841] [describing a construction workers’ regional trust fund to permit workers a paid vacation].)

 Thirty-one states have enacted a prevailing wage law. (Alaska Stat. §§ 36.05.010 to 36.05.900; Ark. Code Ann. §§ 22-9-301 to 22-9-315; Conn. Gen. Stat. §§ 31-53 to 31-55a; Del. Code Ann. tit. 29, § 6960; Haw. Rev. Stat. §§ 104-1 to 104-4; 820 Ill. Comp. Stat. 130/1 to 130/12; Ind. Code Ann. §§ 5-16-7-1 to 5-16-7-5; Kan. Stat. Ann. § 68-2317 [for highway contracts]; Ky. Rev. Stat. Ann. §§ 337.505 to 337.550; Me. Rev. Stat. Ann. tit. 26, §§ 1303 to 1314; Md. Code Ann., State Fin. & Proc. Code, §§ 17-201 to 17-226; Mass. Gen. Laws ch. 149, §§ 26 to 27H; Mich. Comp. Laws §§ 408.551 to 408.558; Minn. Stat. §§ 177.41 to 177.44; Mo. Rev. Stat. §§ 290.210 to 290.340; Mont. Code Ann. §§ 18-2-401 to 18-2-432; Nev. Rev. Stat. §§ 338.020 to 338.095; N.J. Stat. Ann. §§ 34:11-56.25 to 34:11-56.47; N.M. Stat. Ann. §§ 13-4-10.1 to 13-4-17; N.Y. Labor Law § 220.3(a); Ohio Rev. Code Ann. §§ 4115.03 to 4115.16; Or. Rev. Stat. §§ 279C.800 to 279C.870; 43 Pa. Cons. Stat. §§ 165-1 to 165-17; R.I. Gen. Laws §§ 37-13-1 to 37-13-17; Tenn. Code Ann. §§ 12-4-401 to 12-4-415; Tex. Gov’t Code Ann. §§ 2258.001 to 2258.058; Vt. Stat. Ann. tit. 29, § 161 [for state construction projects]; Wn. Rev. Code §§ 39.12.010 to 39.12.900; W.Va. Code §§ 21-5A-1 to 21-5A-11; Wis. Stat. § 66.0903; Wyo. Stat. Ann. §§ 27-4-401 to 27-4-413; see Guam Code Ann. tit. 5, ch. 50, § 50105.)

 See the Davis-Bacon Act (Mar. 3, 1931, ch. 411, 46 Stat. 1494, codified at 40 U.S.C. §§ 3141-3148); U.S. v. Binghamton Construction Co. (1954) 347 U.S. 171, 176-177 [98 L.Ed. 594, 74 S.Ct. 438],

 See Los Angeles Administrative Code, division 10, chapter 1, article 1, section 10.7.1 (requiring payment of the prevailing wage in all city contracts); id., section 10.7 (specifically waiving the city’s rights under the municipal affairs doctrine); see also San Francisco Administrative Code, chapter 6, article U, section 6.22(E) (“All contractors and subcontractors *578 performing a public work or improvement for the City and County of San Francisco shall pay its workers on such projects the prevailing rate of wages . . . .”).

 There are 120 charter cities in the state of California. SBCTC states in its brief that more than half the state’s population lives in charter cities.

 The Legislature recently acted to specify that if a charter city’s ordinance prohibits consideration of a project labor agreement (defined by Pub. Contract Code, § 2500, subd. (b)(1) as a “prehire collective bargaining agreement that establishes terms and conditions of employment,” including wages) for a public works project, “state funding or financial assistance shall not be used to support that project” (Pub. Contract Code, § 2502). (Both provisions added by Stats. 2011, ch. 431, § 2, enacting Sen. Bill No. 922 (2011-2012 Reg. Sess.).) The history of this legislation notes that the law was deemed necessary because “[s]everal counties (Stanislaus, Orange and San Diego) and Charter Cities (Chula Vista and Oceanside) have banned [project labor agreements] . . . .” (Assem. Com. on Business, Professions and Consumer Protection, Rep. on Sen. Bill No. 922 (2011-2012 Reg. Sess.) as amended Sept. 2, 2011, p. 3.)
Just this year, the Legislature returned to the subject and highlighted its commitment to give localities the option of using project labor agreements. Section 2503, added to the Public Contract Code, provides that if a charter city’s ordinance “prohibits, limits, or constrains in any way the governing board’s authority or discretion to adopt, require, or utilize a project labor agreement, . . . then state funding or financial assistance shall not be used to support any construction projects awarded by the city.” (Stats. 2012, ch. 11, § 1.) Both new laws are not effective until January 15, 2015, to allow cities to repeal ordinances that establish blanket bans on project labor agreements.