[L. A. No. 13311. In Bank.—April 18, 1932.]

CITY OF PASADENA (a Municipal Corporation), Petitioner, v. J. W. CHARLEVILLE, City Manager, etc., Respondent.

Harold P. Huls, City Attorney, and John W. Holmes, Deputy City Attorney, for Petitioner.

James H. Howard, Ray W. Bruce, Arthur M. Ellis, Markell C. Baer, Port Attorney (Port of Oakland), Robert M. Ford, Assistant Port Attorney, Roscoe R. Hess, City Attorney (Lynwood), Erwin P. Werner, City Attorney (Los Angeles), John J. O'Toole, City Attorney (San Francisco), Henry Heidelberg, Deputy City Attorney, Louis J. Hardie, City Attorney (Albany), James H. Mitchell, City Attorney (Burbank), Claude L. Rowe, City Attorney (Fresno), C. Stanley Wood, City Attorney (Oakland), Norman E. Malcolm, City Attorney (Palo Alto), Eugene Best, City Attorney (Riverside), C. L. Byers, City Attorney (San Diego), J. F. Goux, City Attorney (Santa Barbara), J. Leroy Johnson, City Attorney (Stockton), F. J. Heid, Jr., City Attorney (Tulare), A. W. Sans, City Attorney (Watsonville), and Wm. J. Locke, City Attorney (Watsonville), *Amici Curiae* on Behalf of Petitioner.

John Dean Barrick for Respondent.

U. S. Webb, Attorney-General, John D. Richer, Deputy Attorney-General, Carl W. Mueller, H. W. Hutton, Albert Michelson, Arthur L. Johnson, Charles F. Lowy, Everett W. Mattoon, County Counsel (Los Angeles County), Ray C. McAllaster, Deputy County Counsel, Earl Warren, District Attorney (Alameda County), Glen M. De Vore, District Attorney (Fresno County) James C. Hollingsworth, District Attorney (Ventura County), Percy C. Heckendorf, District

Attorney (Santa Barbara County), Thomas Whelan, District Attorney (San Diego County), Earl Redwine, District Attorney (Riverside County), Fred L. Thomas, District Attorney (Santa Clara County), James F. Hoey, District Attorney (Contra Costa County), H. Ray Bailey, District Attorney (Kern County), Mason A. Bailey, District Attorney (Madera County), Henry E. Greer, District Attorney (Marin County), F. M. Ostrander, District Attorney (Merced County), and Edmund Scott, District Attorney (San Mateo County), *Amici Curiae* on Behalf of Respondent.

SHENK, J.—This is a petition for a writ of mandate to compel the respondent as city manager of the City of Pasadena to sign a contract authorized by the board of directors of said city for the construction of a galvanized wire fence around the Allen reservoir, a property owned and used by said city as a part of its municipally owned and operated water supply and distributive system.

The city manager refused to sign the contract which was duly awarded to and signed by the contractor, Crown Fence and Supply Company, Ltd., on the ground that said contract did not contain the specification of a general prevailing rate of *per diem* wages as required by the Public Wage Rate Act of 1931 (Stats. 1931, p. 910), and did not contain a provision forbidding the employment of aliens upon the work as provided by the Public Works Alien Employment Act of 1931. (Stats. 1931, p. 913.)

The burden of the petitioner's position is that the enactments aforesaid are not binding on the City of Pasadena, a city organized and existing under a freeholders' charter framed and adopted pursuant to section 8 of article XI of the Constitution, for the reason that the improvement contemplated by the proposed contract constitutes a "municipal affair" as that phrase is used in section 6 of article XI of the Constitution, and is provided for in subdivision 26, added to section 3 of article I of the city charter in 1923. (Stats. 1923, p. 1664.)

The charter of the City of Pasadena was adopted in 1901 pursuant to the provisions of section 8 of article XI of the Constitution. Section 6 of the same article as originally incorporated in the Constitution in 1879 provided that all

charters of cities "framed or adopted by authority of this Constitution shall be subject to and controlled by general laws". In 1896 this section was amended to provide that all charters of cities framed or adopted under the authority of the Constitution "except in municipal affairs, shall be subject to and controlled by general laws". ██ It is the settled law of this state that by the amendment of 1896 the charter city was removed from the control of enactments of the legislature in so far as its charter made provision for the conduct of municipal affairs. "With respect to matters not municipal, or municipal affairs upon which the charter was then silent, the provisions of the general law pertaining thereto would control the subject. (*Fragley* v. *Phelan*, 126 Cal. 395 [58 Pac. 923].) But when the charter, which was previously silent, was amended so as to make a provision upon such municipal affairs, that provision would immediately suspend the general law so far as the two were in conflict (*Byrne* v. *Drain*, 127 Cal. 667 [60 Pac. 433]). On the other hand, if the charter made provision upon a subject not municipal, upon which the general law was silent, a subsequent statute relating thereto would immediately suspend the charter, so far as it was inconsistent therewith." (*Civic Center Assn.* v. *Railroad Com.*, 175 Cal. 441, 445 [166 Pac. 351, 353].)

Further to extend the privilege of autonomy to charter cities, sections 6 and 8 of article XI of the Constitution were amended in 1914 to provide that cities thereafter organized thereunder and cities theretofore so organized were empowered by amendment to the charter "to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws". The City of Pasadena availed itself of the privilege thus extended by the people of the state through the Constitution by an amendment to its charter in 1923. (Stats. 1923, p. 1664.) By the charter amendment the powers of the city "over municipal affairs became all-embracing, restricted and limited by the charter 'only', and free from any interference by the state through general laws. . . . The result is that the city has become independent of general laws upon municipal

affairs.'' (*Morgan* v. *City of Los Angeles*, 182 Cal. 301 [187 Pac. 1050, 1052], quoting from *Civic Center Assn.* v. *Railroad Com., supra; In re Nowak,* 184 Cal. 701 [195 Pac. 402]; *Bank* v. *Bell,* 62 Cal. App. 320 [217 Pac. 538]; see, also, *Rand* v. *Collins,* 214 Cal. 168 [4 Pac. (2d) 529].)

 It follows necessarily from the uniform line of decisions in this state that the City of Pasadena is not subject to or controlled by any enactment of the legislature as to the city's municipal affairs.

 It must also be concluded that the improvement contemplated by the contract in question is a municipal affair. The sole purpose of the contract is the construction of a wire fence around a reservoir which is a part of the city's municipal water system. The supplying of water by a city to its inhabitants is a municipal affair. (*South Pasadena* v. *Pasadena Land etc. Co.,* 152 Cal. 579 [93 Pac. 490].) The building of a dam to be used for impounding water for a municipal water system is a municipal affair. (*Heilbron* v. *Sumner,* 186 Cal. 648 [200 Pac. 409].) The construction of a reservoir as a part of a municipal water system is a municipal affair. (*Williams* v. *City of Vallejo,* 36 Cal. App. 133 [171 Pac. 834].) The money to be expended for the cost of the improvement belongs to the city and the control of its expenditure is a municipal affair. (*Ex parte Braun,* 141 Cal. 204 [74 Pac. 780].) The hiring of employees generally by the city to perform labor and services in connection with its municipal affairs and the payment of the city's funds for services rendered to the city by its employees in the administration of its municipal affairs is not subject to or controlled by general laws. (*Storke* v. *City of Santa Barbara,* 76 Cal. App. 40 [244 Pac. 158]; see, also, *Jackson* v. *Wilde,* 52 Cal. App. 259 [198 Pac. 822].) The charter of the city contains full provisions for the doing of the proposed work by contract or by force account and for payment therefor from municipal funds.

The Public Works Wage Rate Act of 1931 requires that the public body awarding any contract for public work on behalf of the state or of any county, city, city and county, district or other political subdivision of the state, shall ascertain the general prevailing rate of *per diem* wage in the locality in which the work is to be performed for each craft

or type of workmen required for the performance of the contract, and shall specify such rate of wages in the call for bids and in the contract subsequently awarded. It is made a misdemeanor for any public officer wilfu ly to omit to comply with the requirements of the statute, and it is provided that the contractor shall forfeit ten dollars for each day for which any workman shall be paid less than the prevailing rate of wages as established by the contract.

The foregoing statute does not purport to fix or provide for the fixation of the wage to be paid under all employment contracts, public and private. If such was the declared purpose and intent of the act difficulties of constitutional questions would be encountered. (See *Adkins* v. *Children's Hospital,* 261 U. S. 525 [24 A. L. R. 1238, 67 L. Ed. 785, 43 Sup. Ct. Rep. 394].) The obvious purpose of the statute is to prescribe conditions upon which the statute will permit work of a public character to be performed for it or for public agencies of the state over which the legislature may constitutionally exercise control. (See *Atkin* v. *Kansas,* 191 U. S. 207 [48 L. Ed. 148, 24 Sup. Ct. Rep. 124]; *Heim* v. *McCall,* 239 U. S. 175 [Ann. Cas. 1917B, 287, 60 L. Ed. 206, 36 Sup. Ct. Rep. 78].) The question whether this statute is a valid exercise of the power of the legislature to prescribe the conditions incorporated therein as to public work to be performed by public agencies, other than the excluded freeholders' charter cities, is involved in another proceeding now pending in this court. It is now necessary to decide only whether this statute is operative, binding and controlling with reference to public contracts of purely municipal concern in cities, first, which have incorporated in their freeholders' charters the subject matter of the statute and, secondly, in other charter cities which have availed themselves of the privilege extended by sections 6 and 8 of article XI of the Constitution as amended in 1914.

The city and county of San Francisco, a freeholders' charter city, has filed a brief as *amicus curiae* supporting the contention of the petitioner to the effect that the statutes involved herein are not controlling on said city and county for the reason that the subject matter of the statutes has been incorporated in its freeholders' charter. (New Charter, sec. 98; Stats. 1931, p. 3038.) Among other things this sec-

tion of the San Francisco charter provides that every contract for work or improvement, exclusive of purchases, to be performed at the expense of the city and county, or paid out of moneys deposited in the treasury, whether such work be performed by contract or day labor, must provide ''(2) that any person performing labor thereunder shall be paid not less than the highest general prevailing rate of wages in private employment for similar work''. Other conditions and restrictions are also prescribed in the section, but they need not now be referred to. It will be noted that while this charter provision covers the same subject matter as the statute, it is not in conformity therewith in that it is not required by the charter that the prescribed prevailing rate of wages be scheduled in the call for bids or in the contract.

Likewise the port attorney for the port of Oakland, in a brief filed in support of the position of the petitioner, calls attention to a provision of the charter of the city of Oakland requiring that contracts for the performance of labor on behalf of the city shall provide that the contractor pay his employees ''a salary or wage at least equal to the prevailing salary or wage for the same quality of service rendered to private persons, firms or corporations under similar employment in the city of Oakland''. This provision and the method of its application and enforcement are likewise not in conformity with the 1931 statute.

The city and county of San Francisco and the city of Oakland afford examples of instances where city charters have specially provided for the subject matter of the statute to like purpose but by different methods of application and enforcement. There may be other examples not brought to our attention where freeholders' charter cities in this state make provision to like effect. But it is not necessary that the charter specifically legislate on the subject. In order to remove the city's municipal affairs from the control of general laws it is sufficient if the city has availed itself of the offer extended to it by the Constitution as amended in 1914 and has incorporated in its charter an acceptance of the privilege tendered. (*Civic Center Assn.* v. *Railroad Com.,* 175 Cal. 441 [166 Pac. 351]; *Cole* v. *City of Los Angeles,* 180 Cal. 617 [182 Pac. 436]; *Morgan* v. *City of Los Angeles,* 182 Cal. 301 [187 Pac. 1050]; *Rand* v. *Col-*

*lins,* 214 Cal. 168 [4 Pac. (2d) 529].) Where in the one case the charter specifically legislates upon the subject it is deemed a grant of power; and where, on the other hand, the charter in general terms accepts the offer extended by the Constitution, the enumeration of powers is unnecessary and the general language of the acceptance becomes a limitation of the power of the city and is all-embracing so far as the removal of the municipal affairs of the city from the control of the legislature is concerned. (*In re Galusha,* 184 Cal. 697 [195 Pac. 406]; *In re Nowak,* 184 Cal. 701 [195 Pac. 402].)

The City of Pasadena has adopted the second course above referred to and in 1923 amended its charter by adding to section 3 of article I thereof the following: ''The city shall have power: . . . Twenty-sixth. To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter.'' This amendment was adopted in strict conformity with the amendment of section 6 of article XI of the Constitution in 1914. The charter so amended is the fundamental law of the city, subject only, as to its municipal affairs, to the restrictions and limitations of the charter itself, and, of course, subject to the provisions of the Constitution which is the authority for its creation.

■ The necessity for or the desirability of the statute now under discussion are of legislative concern. The judicial question is, where rests the power to enact it so as to make it binding on the City of Pasadena? The answer must be that such power rests only in the people of the state through the Constitution or in the people of the city by or under the authority of its freeholders' charter. ■ It necessarily follows that said statute is not effective, binding or controlling on the petitioner in connection with the execution and performance of the proposed contract, and the refusal of the respondent to sign the contract based on the ground that the provisions of the Public Wage Rate Act of 1931 were not complied with in the letting thereof is not justifiable.

The cases cited by the respondent fall into two classifications. In the first class are cases from other jurisdictions where our system of freeholders' charter municipal government directly under the authority of the Constitution and

solely responsive to it in matters of purely municipal concern does not obtain. Those cases need not be referred to specifically nor be commented upon further than to state that they are not in point on this branch of the present proceeding. In the other class are cases in this state wherein generally it was determined that the particular city transactions involved were not municipal affairs as contemplated by the Constitution. In this class are *Ex parte Daniels,* 183 Cal. 636 [21 A. L. R. 1172, 192 Pac. 443], wherein it was held that the speed limit at which automobiles might be driven was a matter of general state concern and not a municipal affair, and that therefore the State Motor Vehicle Act was controlling over a city ordinance providing a less rate of speed; also, *Esberg* v. *Badaracco,* 202 Cal. 110 [259 Pac. 730], which had to do with a public school question, a matter, under all of our decisions, of general state concern. In none of the cases in this state has it been held that an enactment of the legislature was controlling as to a municipal affair of a city which had in its freeholders' charter legislated on the subject or had availed itself by charter provisions of the offer of further autonomy extended by the 1914 amendment to the Constitution.

██ It is insisted by the respondent and by *amici curiae* in that behalf that the legislation covered by this statute was enacted in pursuance of section 17½ of article XX of the Constitution, adopted in 1914, which provides: "The legislature may, by appropriate legislation, provide for the establishment of a minimum wage for women and minors and may provide for the comfort, health, safety and general welfare of any and all employees."

If the legislature assumed to enact the statute now under consideration under the authority of that portion of the section which purports to be a grant of power to fix a minimum wage, it is at once apparent that the grant did not contemplate that legislation thereunder should extend to the establishment of wages for any class of persons except those specifically mentioned, namely, women and minors. This is so from the unmistakable meaning of the phraseology employed, and such purpose is further disclosed by the argument submitted to the voters of the state when the constitutional amendment was proposed for ratification, wherein it was

stated: "To insure the women and minors of this state a living wage it is most necessary that the voters of California vote 'Yes' on this amendment." The validity of this portion of the constitutional section under the federal Constitution need not now be discussed, as in any event it does not assume to constitute authority for the enactment of the statute.

If the authority for the amendment be, as claimed by the respondent and his supporting *amici curiae,* the second portion of the section of the Constitution above quoted, namely, that the legislature "may provide for the comfort, health, safety and general welfare of any and all employees", it is again apparent that this is a grant of power to do what the legislature, without this specific grant, obviously could do in the exercise of the police power of the state. In passing upon the extent of this grant of power this court said in *Yosemite L. Co.* v. *Industrial Acc. Com.,* 187 Cal. 774, at page 784 [20 A. L. R. 994, 204 Pac. 226, 230]: "The arguments printed on the ballot for the election of 1914, at which this section was adopted, indicate that its main purpose was to authorize the establishment of a minimum wage for women and minors. Nothing whatever is said in the arguments upon any other subject except that there is a suggestion that all employers, bad as well as good, should be compelled to provide proper living and working conditions for their employees. The part of the section authorizing the legislature to 'provide for the comfort, health, safety and general welfare of employees' was, as we think, intended to refer to the comfort, health, safety and welfare of employees during the time of their employment." In other words, section 17½ of article XX of the Constitution only purports "to authorize legislation with reference to 'employees', and its application therefore must be based upon the existence of an employment". (*Pacific Gas & Elec. Co.* v. *Industrial Acc. Com.,* 180 Cal. 497 [181 Pac. 788, 790].) When thus applied the grant is specific and merely cumulative for the reason that under the police power of the state the legislature has the authority now to provide for the general welfare as well as the comfort, health and safety of all of its people, including employees. (*Miller* v. *Board of Public Works,* 195 Cal. 477 [38 A. L. R. 1479, 234 Pac. 381]; Id.,

273 U. S. 781. [71 L. Ed. 889, 47 Sup. Ct. Rep. 460] ; *In re Oswald*, 76 Cal. App. 347 [244 Pac. 940].)

We now turn to the operation and effect of the Public Works Alien Employment Act of 1931. That act provides that no alien shall be employed by any contractor or subcontractor on any public work done for or under the authority of the state, or any officer or department thereof, or for or under the authority of any county, city and county, district, or other political subdivision thereof, and makes it the duty of every public officer thereof to withhold payment to the contractor of a sum equal to ten dollars per day for every alien employed by the contractor or by any subcontractor under him. Failure of performance by the contractor, subcontractor or public officer, in accordance with the statute, is made a misdemeanor.

It was held in *City Street Imp. Co.* v. *Kroh*, 158 Cal. 308, at page 326 [110 Pac. 933, 941], that a provision in the specifications for public road work to the effect that, except by permission of the highway commission, no unnaturalized alien should be employed in the work, was invalid and unenforceable when attempted by public authorities. The ruling was based on the ground that such a provision in the contract was in violation of sections 1 and 17 of article I of the Constitution of this state and in violation of treaty rights. The opinion in that case states that at that time (1910) there was no express authority for the insertion of the restriction in the specifications,. However, in 1901 the legislature passed an act providing that "no person except a native born or naturalized citizen of the United States shall be employed in any department of the state, county, city and county, or incorporated city or town government in this state". In 1915 a statute was enacted to the same effect, but enumerating certain exceptions in its operation, and the 1901 act was repealed. (Stats. 1915, p. 690.) In 1921 the 1915 act was amended principally with reference to the exceptions. (Stats. 1921, p. 546.) Next followed the enactment of the present statute in 1931, which enlarges the restriction against the employment of alien labor to any public work done in this state. It is worthy of note that from 1901 until 1931 none of said enactments has expressly been declared to be invalid. In fact, none has been attacked in

any case called to our attention, and it is stated by counsel for the respondent and not denied that public authorities generally in this state have complied with their provisions.

The holding in the Kroh case to the effect that the obnoxious specification was invalid as in contravention of section 17 of article I of the state Constitution would seem to have been the result of scant consideration and must be considered as overruled. Section 17 of article I of the Constitution provides that "foreigners of the white race, or of African descent, eligible to become citizens of the United States under the naturalization laws thereof, while *bona fide* residents of the state, shall have the same rights in respect to the acquisition, possession, enjoyment, transmission, and inheritance of all property, other than real estate, as native-born citizens; . . . " Section 17 of article I of the Constitution of 1849 was to like effect so far as the problem here presented is concerned. In the case of *Norris* v. *Hoyt,* 18 Cal. 217, it was held that the purpose of this section of the Constitution of 1849 was to remove the disability, under the common law, of foreigners, *bona fide* residents of this state, to acquire property by descent or other operation of law. In *State* v. *Smith,* 70 Cal. 153 [12 Pac. 121], it was held that this section as originally incorporated in the Constitution was intended to prohibit the legislature from depriving resident foreigners of any of the rights enjoyed by native-born citizens with respect to the acquisition, possession, enjoyment, transmission or inheritance of property. In 1894 the section was amended to exclude the acquisition, etc., of real estate from the benefits intended to be thereby conferred. It has never been held that this section confers upon resident aliens the constitutional right to be employed on public work. No person has a vested right to work for the state or any of its public agencies upon public work. (*Atkin* v. *Kansas,* 191 U. S. 207 [48 L. Ed. 148, 24 Sup. Ct. Rep. 124].) Such right is a privilege granted by or under the authority of the state and may be granted under such terms and conditions, not in conflict with law, as the state may see fit (*Norris* v. *City of Lawton,* 47 Okl. 213 [148 Pac. 123]), and we do not

construe section 17 of article I of our Constitution to confer such a right.

In *City Street Imp. Co.* v. *Kroh, supra,* section 1 of article I of our Constitution was also cited as invalidating the specification that, except by permission of the highway commission, no unnaturalized alien shall be employed in the work; also that said specification was in violation of "treaties with almost all the nations from which this country receives immigrants". After that decision in 1910 litigation arose in the state of New York concerning the validity of a statute in that state providing that: "In the construction of public works by the state or a municipality, or by persons contracting with the state or such municipality, only citizens of the United States shall be employed; and in all cases where laborers are employed on any such public works, preference shall be given citizens of the state of New York." It was contended by the contractor that this enactment of the legislature was void as in contravention of sections 1 and 6 of article I of the New York Constitution, as broad in effect as the same provision of the California Constitution; void under the equal protection and due process clauses of the federal Constitution; and void as a discrimination against aliens under treaty rights. The New York Court of Appeals in an exhaustive treatment of the subject, in February, 1915, held that all of those contentions were without support. (*People* v. *Crane,* 214 N. Y. 154 [Ann. Cas. 1915B, 1254, L. R. A. 1916D, 550, 108 N. E. 427].) That case reached the Supreme Court of the United States in the same year and was affirmed on November 29, 1915. (*Crane* v. *New York,* 239 U. S. 195 [60 L. Ed. 218, 36 Sup. Ct. Rep. 85].) The reasoning and conclusions of the court of last resort are more·fully disclosed in the opinion in the companion case of *Heim* v. *McCall,* 239 U. S. 175 [Ann. Cas. 1917B, 287, 60 L. R. A. 206, 36 Sup. Ct. Rep. 787], decided on the same day. The holding in those two New York cases was grounded largely on the prior decision of the court in *Atkin* v. *Kansas,* 191 U. S. 207 [48 L. Ed. 148, 24 Sup. Ct. Rep. 124], where it was declared that it belongs to the state, having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf. The Atkin

case was decided in 1903 and involved the constitutionality of a Kansas statute prescribing a maximum of eight hours' labor on public works, and the enactment was held to be valid. In 1890 this court held that an ordinance of the city of Los Angeles making it a misdemeanor for any contractor with the city to employ any person to work more than eight hours per day, or to employ Chinese on the public work, was invalid. (*Ex parte Kuback,* 85 Cal. 274 [20 Am. St. Rep. 226, 9 L. R. A. 482, 24 Pac. 737].) The right of any legislative body in this state to prohibit the employment of alien Chinese on public work may not be questioned and the restriction of eight hours' work per day on public work has become imbedded in the Constitution by the amendment of section 17 of article XX in 1902.

▇ Since the decisions of the Supreme Court of the United States in *Heim* v. *McCall, supra,* and *Crane* v. *New York, supra,* it must be considered as settled that it is competent for a state to exclude aliens from employment on its public work and that the statute here under attack is likewise not obnoxious to any provision of the state Constitution.

▇ It remains to determine whether the Alien Labor Law of 1931 is effective and binding on freeholders' charter municipalities in this state. In other words, is the matter of the employment of aliens on public works one of local concern and a municipal affair or is it such a matter of general public or state concern as that the statute is binding on such freeholder charter cities? We have concluded that this statute is such an act of sovereignty as to constitute the subject matter thereof of general state concern as distinguished from a local or municipal affair. All public works and all public property in the state in a broad sense belongs to all of the people of the state. Whether the ownership or title thereof be in the state or in a municipality or in some other governmental agency of the state, such ownership and title are held in trust for the people of the state. That is to say, the state and its public agencies are the guardians and trustees of the people in the ownership, construction and maintenance of its public works and property. When considered in this connection the "people of the state" may be said to constitute that body of citizens who have become organized and function

as the state and through whom the state derives and exercises its powers. The obligations of the state on the one hand and of its citizens on the other are reciprocal. Neither could exist without the other. The state exercises its sovereign power on behalf of its citizens. It likewise imposes upon them the duties of citizenship and may even require them to take up arms at the call of the Governor to execute the laws of the state, to suppress insurrections and to repel invasions. (Const., sec. 1, art. VIII.) By section 1895 of the Political Code aliens are permitted to claim exemption from this military service.

This state has declared and enforced a policy of prohibiting the sale, etc., of agricultural lands in the state to ineligible aliens. That this policy, as a matter of general state concern, would be binding on a freeholders' charter city owning extensive areas of agricultural lands can, we think, admit of no serious doubt. Thus to interfere and prohibit the sale of its agricultural lands would be to control and limit to that extent the disposition of city property, but if the Alien Land Law be expressive of a state policy and in pursuance of a general state concern, the municipality must yield to the paramount authority of the state. Again, since the property and funds of the state and its agencies, in a broad sense, belongs to its citizens, it would seem to be a wise and beneficent state policy so to conduct its affairs that its funds be available to its citizens for services rendered on public works to the extent that it may constitutionally do so. It may and does prefer its citizens in matters of relief, and may otherwise discriminate in their favor. It is definitely settled: "No employee is entitled, of absolute right and as a part of his liberty, to perform labor for the state; and no contractor for public work can excuse a violation of his agreement with the state by doing that which the statute under which he proceeds distinctly and lawfully forbids him to do." (*Adkin* v. *Kansas,* 191 U. S. 207 [48 L. Ed. 148, 24 Sup. Ct. Rep. 124, 128].) Reasons of public policy may well be invoked against the employment of aliens on public work, in addition to the mere preferment of citizens. Assuming that the municipality be in position to raise the constitutional question, it would be of no avail and it may not rightly object to the

allocation of its funds to citizens for services rendered on public work if, as we hold, such purpose be a matter of general state policy, as distinguished from a municipal affair. There are differences of opinion as to the wisdom of such a policy, but with the wisdom of such a course the courts are not concerned to the point that they may override the policy thus declared by the legislature. The duty of the courts is to see that the legislation is kept within constitutional bounds and is definite and certain in the method of its application. With this latter consideration no difficulty is encountered in this proceeding.

For the reason that the respondent was justified in refusing to sign the contract without its compliance with the Public Works Alien Employment Act of 1931, the petition for the peremptory writ is denied.

Waste, C. J., Seawell, J., Curtis, J., Langdon, J., Preston, J., and Tyler, J., *pro tem.*, concurred.