Filed 6/13/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PALM SPRINGS PROMENADE, LLC, Plaintiff and Appellant, v. DEPARTMENT OF INDUSTRIAL RELATIONS, Defendant and Respondent. | D083069 (Super. Ct. No. CVPS2202816) |

APPEAL from a judgment of the Superior Court of Riverside County, Eric A. Keen, Judge. Affirmed.

Buchalter, Vincent Whittaker, Efrat M. Cogan, Skye Daley, and Chandra Roam for Plaintiff and Appellant.

Molteni Employment Law and Maria Cristina Molteni for amicus curiae on behalf of United Union of Roofers, Waterproofers, and Allied Workers, Local 81.

Ken Lau, Chief Counsel and Mirna Solis, Staff Counsel for Defendant and Respondent.

# INTRODUCTION

Palm Springs (City), a resort city in southern California's Coachella Valley in the County of Riverside, is a charter city under the state's Constitution. (Cal. Const., art. XI, § 5.) Pursuant to the "home rule" provision, a city organized under a charter is allowed to govern itself without interference by the legislature on certain matters. (*Id.*, at subd. (a) (Section 5(a)).) One of those subject areas is that a charter city can exempt itself from the Prevailing Wage Law (PWL) (Lab. Code, §§ 1720, subd. (a)(1), 1770)[1] and pay workers less than "prevailing wages" on projects deemed "municipal affairs." In 2002, the City passed such an ordinance. (Palm Springs Mun. Code, § 7.06.030.)

Real party in interest Palm Springs Plaza (PSP) purchased an almost vacant mall comprising 13 acres in the City's downtown tourist area (Subject Property).[2] In 2010, almost 10 years after the purchase, PSP and the City entered into an agreement allowing PSP to renovate the dilapidated shopping center into a new multipurpose development, called Desert Fashion Plaza, which would bring much-needed vitality to the area. Relying on the City's municipal code, PSP paid employees building the Subject Property lower wages than the PWL required.

As an issue of first impression, we must decide whether a construction project is a "municipal affair" of a charter city pursuant to Section 5(a) if the

---

[1]     All further statutory references are to the Labor Code unless otherwise stated.

[2]     PSP was specifically created by the Wessman Development Company for the purpose of entering into the development agreement with the City. In 2001, Wessman Development Company purchased the parcel on which the old mall stood.

2

charter city contributes local funds for the construction of public improvements within a private development—a project in which the developer selects the contractors, then itself enters into construction contracts that pay workers less than prevailing wages; and postconstruction, owns and manages the bulk of the development. We hold that where the charter city contributes money to a private development project, that undertaking does not necessarily transform the project into a municipal affair.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *PSP Acquires the Subject Property*

In 2001, PSP purchased for about $17 million the 13-acre, multi-block, then "largely vacant" Subject Property located in the downtown area of the City. Over the next 10 years, the City, the City of Palm Springs Community Redevelopment Agency (Redevelopment Agency),[3] and PSP engaged in a "number of joint efforts" to develop the Subject Property.

Various proposals were unsuccessful until 2011, when the parties executed the Project Financing Agreement (Agreement). The Agreement implemented a revitalization plan that involved "a mix of retail[,] commercial, resort hotel, and residential uses" (Project). A City staff report stated that "[i]n addition to facilitating the *private development* of the Project," the Agreement would reenergize the downtown area and create value "for all concerned." (Italics added.)

---

[3] Effective February 1, 2012, the Legislature dissolved all state redevelopment agencies, including the City's Redevelopment Agency. (Health & Saf. Code, § 34172, subd. (a)(1) [providing in part: "All redevelopment agencies and redevelopment agency components of community development agencies . . . that were in existence on the effective date of this part are hereby dissolved and shall no longer exist as a public body, corporate or politic."].)

3

Before entering into the Agreement, the City hired a well-known financial consultant to evaluate the "economic feasibility" of the Project. The consultant projected that the total replacement Project costs would be at least $100 million, and that "$40 to 45 million . . . in public participation would be necessary" to support it. As a result of the study, the City recognized the "*private development*" was not financially feasible without the infusion of public funds. (Italics added.)

**B.  *The Agreement***

The Agreement recited that redevelopment of the Subject Property was "critical to restoring economic vitality to downtown Palm Springs, and that successful redevelopment" would, "as is almost always the case with downtown areas, require public-private participation and funding."

Although the Agreement recognized the parties' "public-private" participation, it specifically acknowledged that the parties' legal relationship was "neither that of a partnership nor that of a joint venture and that neither the City nor the Developer shall be deemed or construed for any purpose to be the agent of the other Party, and neither Party shall have the power or the authority to speak on behalf of the other Party or to bind the other Party to any contractual or other obligations."

Attached as an exhibit to the Agreement was the project site plan. Under the project site plan, the Subject Property was divided into various "block units" to avoid a "monolithic development," and new streets were added to improve circulation, enhance mountain views, and provide vehicle access to the nearby Palm Springs Art Museum. Once completed, the Project would transform the "blighted" Subject Property into a multi-block, pedestrian-friendly "urban village" comprised of residential, retail, and

4

restaurant space, and a luxury hotel.  The Agreement defined the majority of these blocks as "private improvements."

The Project was slated to be completed in phases.  In phase I, "public investment [would] be used to reopen public streets and refurbish an underutilized parking garage."  Additional phases included the development of residential units and office space, which would "begin to shape Downtown into a true 24-hour community."  Unlike phase I, no "public participation" was contemplated for the "later phases" of the Project, and PSP was under no obligation to develop any future phase.

The Agreement required the City to purchase about five acres of the Subject Property from PSP, consisting of:  (1) the previously described multi-level parking structure with over 1,000 above and below ground parking spaces to be refurbished and used for free public parking; (2) land for new public streets; and (3) a large area permanently dedicated for public use.  The City agreed to pay PSP (1) $32 million to acquire these assets "and fund project incentives for the completion of the Project"[4]; and (2) $11 million for PSP to construct the new streets and refurbish the existing parking facilities (Public Improvements).  The City would obtain the $43 million by issuing lease revenue bonds through the City of Palm Springs Financing Authority (Financing Authority).[5]

Also under the Agreement, PSP agreed to (1) upgrade the facades of one of the buildings on the Subject Property; (2) demolish certain designated buildings; and (3) in their place construct new buildings, including a " 'state

---

[4]    The $32 million would be paid into an escrow account against which PSP could draw to make private improvements.

[5]    The Financing Authority was a "joint powers authority" created by the City and its (former) Redevelopment Agency.

of the art' " multi-plex movie theater, while leaving finished pads for future development (Private Improvements). PSP was responsible for all costs and expenses in obtaining the entitlements for, and construction of, the Private Improvements.

In late 2014, the City used local funds to purchase another unfinished block within the Subject Property for $5.3 million. PSP agreed to use those funds to construct additional underground parking within the Subject Property and to deliver to the City a graded pad within the Project ready for development. The City, "at its cost," would "scope, design, bid, and contract for the construction" of a public event center on the new pad.

As the Project progressed, the City paid PSP about $3.06 million for change orders the City requested for upgrades to parking structures and improvements to the "event center park site." These expenditures were for items "outside of the scope of the Public Improvements" identified in the Agreement.

In addition to receiving about $51.36 million of funds from the City ($32 million + $11 million[6] + $5.3 million + $3.06 million),[7] PSP contributed

---

[6]    The City's $11 million payment to PSP to refurbish the parking garage and streets was an "investment[ ] in public infrastructure just as other communities make, and [did] not represent a subsidy to [PSP]." In 2011, the City estimated it would cost in excess of $30 million to construct new parking structures on the Subject Property, as opposed to merely refurbishing those structures as called for in the Agreement.

[7]    According to PSP, on appeal the Department of Industrial Relations (DIR) argues, allegedly for the first time, that the nonmunicipal Financing Authority, and not the City, provided $43 million ($32 million + $11 million) in public funds, and that the City's contribution to the Project was therefore limited to about $3.1 million (ostensibly excluding the $5.3 million the City paid for block E in 2014). PSP therefore argues the DIR is estopped from claiming the $42 million came from a nonmunicipal source, based on express

6

$75 million of its own funds and obtained an additional $68 million through personally guaranteed construction loans, for a total private investment of $143 million.

The City neither selected the preconstruction and/or the construction contractors nor entered into any of the contracts. To secure PSP's performance, the Agreement required PSP to encumber the Subject Property with a Performance Trust Deed in the City's favor. The Performance Trust Deed "ensure[d] that the City's investment in the property result[ed] in the completion of the . . . project," allowing the City "to control the ultimate disposition of the property and the project" in the event PSP defaulted. Once the Private and Public Improvements were "substantially completed," the Agreement required the City to release and reconvey the Performance Trust Deed "in full."

PSP, through separately created LLCs, executed the third-party construction contracts to build the Private Improvements. The Agreement encouraged PSP to "us[e] businesses and contractors whose work force resides in the Coachella Valley," but provided "in no case or event will [PSP] have any legal obligation to do so."

The Agreement required the $32 million payment from the City to be deposited into an acquisition escrow account. After the acquisition escrow closed following the satisfaction of various contingencies, the money would be transferred into a private improvement escrow account, managed by an Independent Fund Control (IFC) agent, for PSP to use to construct the

findings the DIR made in the administrative proceedings that the City was the source of these funds. Because we conclude construction of the Project was not a municipal affair even if the $43 million in local funds was from a municipal source, we deem it unnecessary to address PSP's estoppel claim. (*Antounian v. Louis Vuitton Malletier* (2010) 189 Cal.App.4th 438, 455.)

7

Private Improvements.[8]  The remaining $11 million the City paid PSP was deposited into a public improvement escrow account also overseen by the IFC agent, which money PSP used for the Public Improvements (i.e., construction of streets and refurbishment of parking facilities).  PSP then would submit reimbursement requests to the independent IFC agent, who reviewed billing documents and disbursement requests for both the Private and Public Improvements, approved payment requests, and issued payment.

Pursuant to former section 7.06.030[9] of the City's Municipal Code, which excluded public projects from the PWL, PSP paid the workers constructing the Project less than the prevailing wage.

C. *The DIR Determines the PWL Applies and the Trial Court Affirms*

In 2017, as construction of Project's phase I continued, the Center for Contract Compliance[10] requested the DIR to make a coverage determination about whether the Project was subject to the City's PWL exemption ordinance.  In August 2018, the DIR determined the Project "constitute[d] a

---

[8]    To the extent Private Improvement costs exceeded $32 million, PSP alone was responsible for that overrun.

[9]    We note that effective January 1, 2015, the City amended its prevailing wage policy to comply with section 1782, subdivision (a).  Section 1782 now prohibits a charter city from receiving or using "state funding or financial assistance for a construction project if the city has a charter provision or ordinance that authorizes a contractor to not comply" with the PWL on any "public works contract."  (§ 1782, subd. (a).)  However, subdivision (f)(1) provides that section 1782, subdivision (a) does not apply to contracts "awarded *prior to* January 1, 2015."  (*Id.*, subd. (f)(1), italics added.)

[10]    The Center for Contract Compliance "is a non-profit labor management committee established pursuant to the Labor Management Cooperation Act of 1978."

public work subject to prevailing wage requirements." In 2020, the DIR affirmed this finding after an administrative appeal.

In July 2022, PSP filed a writ of mandate petition in the superior court pursuant to Code of Civil Procedure section 1085.[11] The writ challenged the DIR's determination. The City filed a "position statement" and joined in the petition. Affirming the DIR's determination, the trial court denied the writ of mandate. PSP's timely appeal followed. The United Union of Roofers, Waterproofers, and Allied Workers, Local 81 (Local 81) filed an amicus brief in support of the DIR.

## DISCUSSION

### A. *Standard of Review*

The application of the home rule doctrine is a question of law we review independently. (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 558 (*City of Vista*).)

### B. *The PWL*

The overarching purpose of the PWL is to "protect and benefit employees on public works projects. This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987 (*Lusardi Construction Co.*).)

_____

11    Code of Civil Procedure section 1085, subdivision (a) states, "A writ of mandate may be issued by any court to any inferior tribunal . . . to compel the performance of an act which the law specially enjoins . . . ."

9

Under the PWL, therefore, those employed on "public works"[12] must generally be paid at least the "prevailing rate of per diem wages for work of a similar character" in the area.  (§ 1771.)  As relevant here, "public works" includes "[c]onstruction, alteration, demolition, installation, or repair work done under contract and paid for in whole *or in part* out of public funds" (§ 1720, subd. (a)(1), italics added); and "construction" includes "work performed during the design, site assessment, feasibility study, and other preconstruction phases of construction, . . . and work performed during the postconstruction phases of construction" (*ibid.*).

## C. *The Home Rule Provision*

The home rule provision provides that charter cities "may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws." (Section 5(a).)  Pursuant to Section 5(a), city charters enacted "with respect to municipal affairs . . . supersede all laws inconsistent therewith."  (*Ibid.*)

The Supreme Court in *City of Vista* applied a four-part "analytical framework for resolving whether or not a matter falls within the home rule authority of charter cities." (*City of Vista, supra*, 54 Cal.4th at p. 556.)  The

---

12    To avoid confusion, as will be seen the terms "public works" and "municipal affairs" have different meanings.

first step is to determine if "the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair.' "[13] (*Ibid.*)[14]

" 'No exact definition of the term "municipal affairs" can be formulated, and the courts have made no attempt to do so, but instead have indicated that judicial interpretation is necessary to give it meaning in each controverted case.' " (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 16.) Nonetheless, the Supreme Court has offered some guidance in what constitutes a "municipal affair," explaining that the phrase "refer[s] to the internal business affairs of a municipality." (*City of Walnut Creek v. Silveira* (1957) 47 Cal.2d 804, 811 (*City of Walnut Creek*).)

_____

[13] We note several cases state that, to be exempt from the PWL, a matter must be a "purely" municipal affair. (See e.g., *Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 501 [legislative intent to preclude action on the same subject by an electorate "is more readily inferred if the statute addresses a matter of statewide concern rather than a *purely* municipal affair" (italics added)]; *Baggett v. Gates* (1982) 32 Cal.3d 128, 136 ["charter provisions, ordinances or regulations 'relating to matters which are *purely* "municipal affairs" ' " prevail over general state laws covering the same subject matter (italics added)]; accord, *Vial v. City of San Diego* (1981) 122 Cal.App.3d 346, 348 (*Vial*).) We note, however, that the Supreme Court omitted "purely" when discussing municipal affairs in its recent *City of Vista* decision. (*City of Vista, supra*, 54 Cal.4th at p. 547.) Because our decision in this case does not rest on that distinction, we do not address it.

[14] In the remainder of the *City of Vista* test a court must (2) " 'satisfy itself that the case presents an actual conflict between [local and state law],' " (3) "decide whether the state law addresses a matter of 'statewide concern,' " and (4) "determine whether the law is 'reasonably related to . . . resolution' of that concern [citation] and 'narrowly tailored' to avoid unnecessary interference in local governance." (*City of Vista, supra*, 54 Cal.4th at p. 556.) Because the Project was not a "municipal affair," we do not reach these factors.

For example, the Supreme Court in *City of Vista* analyzed whether wages paid to contract workers by a charter city to construct a public works were a municipal affair. (*City of Vista, supra*, 54 Cal.4th at p. 556.) There, city voters approved a half-cent sales tax to fund the construction and renovation of several public buildings, including two new fire stations. (*Id.* at p. 552.) Pursuant to a local ordinance, later challenged by a labor union, the city council adopted a resolution approving contracts to build the two fire stations and authorizing the mayor to execute the contracts without complying with the PWL. (*Id.* at p. 553.)

*City of Vista* concluded "[t]he wage levels of contract workers constructing locally funded public works are certainly a 'municipal affair.' " (*City of Vista, supra*, 54 Cal.4th at p. 558.) For support, the Supreme Court relied on its decision in *City of Pasadena v. Charleville* (1932) 215 Cal. 384 (*Charleville*), which, in its time, was a "test case" to decide whether the Legislature's enactment of the PWL applied to charter cities. (*City of Vista,* at pp. 558–559.)

*Charleville* involved a writ of mandate action brought to compel a charter city's manager to sign a contract to build a fence around a city-owned reservoir, after the city manager refused to sign the contract because it did not comply with the then newly enacted PWL. (*Charleville, supra*, 215 Cal. at p. 387.) *Charleville* held "the issue of wage levels of contract workers improving a city-owned reservoir was, as a matter of law, a 'municipal affair.' " (*City of Vista, supra,* 54 Cal.4th at p. 559.)

In analyzing *Charleville,* the Supreme Court in *City of Vista* explained, " '[t]he sole purpose of the contract [in *Charleville*] is the construction of a wire fence around a reservoir which is a part of the city's municipal water system. The supplying of water by a city to its inhabitants is a municipal

12

affair. [Citation.] The building of a dam to be used for impounding water for a municipal water system is a municipal affair. [Citation.] The construction of a reservoir as a part of a municipal water system is a municipal affair. [Citation.] The money to be expended for the cost of the improvement belongs to the city and the control of its expenditure is a municipal affair. [Citation.] The hiring of employees generally by the city to perform labor and services in connection with its municipal affairs and the payment of the city's funds for services rendered to the city by its employees in the administration of its municipal affairs is not subject to or controlled by general laws.'" (*City of Vista, supra*, 54 Cal.4th at p. 559, quoting *Charleville, supra*, 215 Cal. at p. 389.)

Applying the holding and reasoning in *Charleville*, *City of Vista* concluded "the construction of a *city-operated facility* for the benefit of a *city's inhabitants* is quintessentially a municipal affair, as is the control over *the expenditure of a city's own funds*. Here, the two fire stations in the [c]ity of Vista, like the municipal water system in *Charleville* . . . are facilities operated by the city for the benefit of the city inhabitants, and they are financed from the city's own funds. We conclude therefore that the matter at issue here involves a 'municipal affair.'" (*City of Vista, supra*, 54 Cal.4th at p. 559.)

**D. *Analysis***

Both parties primarily rely on *City of Vista* for support. PSP argues that former section 7.06.030 of the Palm Springs Municipal Code, and not the PWL, applies to the third-party construction contracts it executed. PSP reasons that under *City of Vista*, the construction was a municipal affair because the City "contributed City tax dollars and retained fiscal control over how all construction monies were spent," ensuring that its contribution

13

"would be used on the public improvements and that the entire project was built so as to enhance the value of the City's public improvements and its public investment in the project."

The DIR and Local 81 argue that the construction was not a municipal affair because unlike the facts in *City of Vista*, the Project did not involve "construction of a city-operated facility, using the city's own funds." Instead, they argue the contract workers' wages were for a "commercial project by a private developer, built on privately-owned land, constructed primarily to profit a private party, with minimal municipal funding," under circumstances where the municipality exercised little control over the construction or disbursement of funds. We conclude the DIR and Local 81 have the better argument.

To start, we agree with the parties that construction of the Project's phase I satisfies the definition of "public works" under section 1720, subdivision (a)(1). The undisputed evidence shows that the City "contributed City tax dollars" toward the "construction, alteration, [and/or] demolition" of the Subject Property. (*Ibid.*) As such, the PWL applies unless it is superseded by the City's home rule.[15]

We do not agree, however, that the City "retained fiscal control over how *all* construction monies were spent," as PSP posits. (Italics added.) Although the City's contribution of funds for the Project was not insignificant (i.e., about $51.36 million, including funds for public infrastructure

_____

[15] At oral argument before this court, PSP noted the "de minimis" exception to a "public works" project did not apply in this case because the City's contribution of funds toward the Project was more than "2 percent of the total project cost." (§ 1720, subd. (c)(3)(B)(i).) We note the de minimis exception is inapplicable to this case for another reason: It does "not apply to a project that was advertised for bid, or a contract that was awarded, *before* July 1, 2021." (*Id.*, subd. (c)(3)(B)(iii), italics added.)

14

construction), PSP contributed almost *three times* that amount (i.e., $143 million). PSP also selected the contractors and entered into the construction contracts for the Project, and alone bore the risk of any cost overruns for redevelopment of the Private Improvements. These responsibilities comprised the majority of the Project. In addition, an IFC agent, and not the City, reviewed billing documents and disbursement requests PSP submitted for its construction of both the Private and Public Improvements. These facts support the inference that it was PSP, and not the City, that retained substantial control over how *its* "construction monies" were spent.

The facts of this case are thus readily distinguishable from those in *City of Vista*. Unlike the City here, the charter city in *City of Vista* itself entered the construction contracts for the public buildings, oversaw that construction, and alone paid for it out of local funds. (*City of Vista, supra*, 54 Cal.4th at p. 559.) As a result of the City of Vista engaging in the procurement process, the municipality was able to take advantage of a local ordinance and save taxpayers money by entering contracts in which workers received less than prevailing wages.

Our facts are also distinguishable from those in *Charleville*. Like the charter city in *City of Vista* and unlike the City here, the municipality in *Charleville* itself engaged in the procurement process, agreeing to a contract for the construction of a fence around a reservoir it owned, which paid the contract workers less than prevailing wages pursuant to the charter city's local ordinance. (*Charleville, supra*, 215 Cal. at p. 387.)

Another material difference between the instant case and *City of Vista* or *Charleville* is the purpose of, and ends to be achieved by, the construction. Unlike the projects in *City of Vista* and *Charleville* that were solely for a public purpose that benefitted the charter cities' inhabitants (i.e., fire

15

stations in *City of Vista* and a fence around a reservoir in *Charleville*), here the record shows the redevelopment of the Subject Property was primarily, though not exclusively, for PSP's benefit.

Indeed, for years PSP sought to redevelop the Subject Property, refusing to enter into an agreement with the City until it received a certain rate of a return on its private investment. Although the City also received a benefit—eliminating blight in the downtown area and increasing the City's sales and property tax revenues—the facts do not support PSP's contention that "the *entire* project was built as to enhance the value of the City's *public improvements* and its *public* investment in the project." (Italics added.) Rather, we find the facts demonstrate the converse is true: the Project was primarily built to enhance the value of PSP's *Private Improvements* (it owned and managed postconstruction concerns, including retail shops, restaurants, cafes, and public gathering spaces) and its *private* investment.

In sum, we conclude *City of Vista* and *Charleville* are distinguishable from the case before us.

PSP also relies on our decision in *Vial, supra*, 122 Cal.App.3d 346, arguing *Vial* provides "a clear resolution" of the present issue because it "squarely decided that a charter city resolution exempting public works projects from prevailing wages constituted a municipal concern." We are not persuaded.

*Vial* involved an appeal from an order denying the petition of the DIR for a writ of mandate compelling the city of San Diego to comply with the PWL, after the city council had adopted a resolution "declaring payment of prevailing wages to be appropriate 'only when required by Federal or State grants and on other jobs considered to be of State concern.' " (*Vial, supra*,

16

122 Cal.App.3d at p. 347.)  The trial court denied the petition, and we affirmed.

In so doing, we recognized a charter city "enjoys autonomy over its 'municipal affairs' " under the home rule provision, and that "a charter city's ordinances which deal with purely municipal affairs are valid even if they conflict with general laws," unless the general laws involve subject matters of statewide concern.  (*Vial, supra*, 122 Cal.App.3d at p. 348.)  Relying on *Charleville*, we concluded the PWL is "a general law" and "does not apply to the public works projects of a chartered city, as long as the projects in question are within the realm of 'municipal affairs' " (*ibid.*); and that "[t]he expenditure of a city's funds on such projects and the rates of pay of the workers *whom it hires* to carry them out are municipal affairs" (*ibid.*, italics added).

*Vial* does not present a "clear resolution" of the "present issue," as PSP contends, because that case involved only the DIR's blanket challenge to a charter city's resolution made pursuant to its home rule authority.  (*Vial, supra*, 122 Cal.App.3d at p. 348.)  Unlike the present case, *Vial* did not examine a specific public works project and whether it qualified as a municipal affair under the home rule doctrine, exempting the charter city from paying prevailing wages to workers under the PWL.  *Vial* thus does not inform our analysis here.

PSP relies on other cases to assert a project funded by a charter city that also benefits a private party "can appropriately be said to serve a public purpose and constitute a municipal affair"; the focus centering on benefits to the charter city and not to the private party.

One such case is *City of Los Angeles v. Superior Court of County of Los Angeles* (1959) 51 Cal.2d 423 (*City of Los Angeles*).  *City of Los Angeles* is

17

inapposite since it neither involved the home rule provision nor whether a construction project was a municipal affair. Rather, the case involved challenges to the validity of the parties' contract, including whether it served a "proper public purpose" by trading land and improvements then known as "Wrigley Field"[16] in return for a baseball team's relocation and construction of a new stadium. (*Id.* at pp. 431–433.) Here, no similar challenge was made to the Agreement executed by the City and PSP, including on the basis that the Project did not also serve a valid public purpose.

PSP also relies on *City and County of San Francisco v. Patterson* (1988) 202 Cal.App.3d 95 (*City and County of San Francisco*). There, the Court of Appeal invalidated an initiative petition that restricted the ability of the city, county, or school district, individually or collectively, to lease or sell its property. As to the city and county, the court held that any restriction on the board of supervisor's charter-based discretionary authority had to be accomplished by charter amendment and not by initiative. (*Id.* at pp. 102–104.)

As to the school district, the court held that, as an agency of the state, "the school system is a matter of general state concern and is not a municipal affair. [citation]." (*City and County of San Francisco, supra*, 202 Cal.App.3d at p. 101.) That court concluded, "[t]he Education Code represents the Legislature's comprehensive enactment of laws regulating public schools and school districts on a statewide basis, and from which the power of the local

---

16      To clear up any confusion from oral argument before this court, in addition to the ball field in Chicago, there was a Wrigley Field in Los Angeles that opened in 1926. For decades, it was home to minor league baseball teams and in 1961, to the Los Angles Angels, a major league team. (<https://sabr.org/journal/article/los-angeles-wrigley-field-the-finest-edifice-in-the-united-states/> [as of June 11, 2025] archived at <https://perma.cc/8U94-ZWK4>.)

18

school board derives. Indeed, the Education Code explicitly regulates the sale of real property by a school district." (*Ibid*.) The matter here does not involve a city regulation over-reaching its authority. We find *City and County of San Francisco* does not, therefore, address the issues presently before us.

Finally, PSP argues the home rule cases "distinguish between state laws that set procedural requirements (. . . where courts are more likely to find the matter to be of statewide concern) and state laws that set substantive limits on local legislative bodies (as in *Vista*, where no such deference is given)." However, whether a state law is procedural or substantive is relevant to part three of the four-part analytical framework, as described in *City of Vista*. (*City of Vista, supra*, 54 Cal.4th at pp. 563–564.) Because we conclude the construction of the Project was not a municipal affair, we need not reach the remaining factors in the *City of Vista*'s "analytical framework."[17]

In this matter, PSP owned the Subject Property to be redeveloped and for years sought to commercially develop it by making various proposals to the City that would yield to PSP a certain rate of return on its investment. PSP also was solely responsible for selecting the contractors to build the project and entering into agreements with them that set the wages of the contract workers; PSP contributed about three-quarters of the funds needed to complete the project; and PSP owned and managed the private improvements after the development was completed. This comprised a

---

17     We note that other courts have refused to "enter the legal thicket" of determining whether a state law is "procedural or substantive," noting that while such an inquiry may "have some bearing on whether it addresses a statewide concern and is narrowly tailored to resolve that concern," merely "labelling it as one or the other should not be the decisive factor in its application to charter cities." (*City of Huntington Beach v. Becerra* (2020) 44 Cal.App.5th 243, 268.)

majority of the redevelopment effort.  The City owned only the public improvements, which were limited to parking structures, new roads, open spaces, and buying back property from PSP, which included a dirt pad that the City would separately develop as an events center.

Based on the totality of the record, we independently conclude PSP's project was not a municipal affair which would allow PSP to "step into the shoes" of the City to take advantage of the home rule doctrine and the City's anti-PWL ordinance.  To hold otherwise would unnecessarily expand the concept of "municipal affairs" to include the "internal business affairs" of a private party (see *City of Walnut Creek, supra*, 47 Cal.2d at p. 811 ["municipal affairs" refers a charter city's "internal business affairs"]); and undermine the important goals of the PWL (*Lusardi Construction Co., supra*, 1 Cal.4th at p. 987).

### DISPOSITION

The judgment is affirmed.  The DIR to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


RUBIN, J.

WE CONCUR:



McCONNELL, P. J.



CASTILLO, J.


20